Statement of the Case.
MONROE, J.
Defendants, having been jointly indicted and tried together for the murder of Walter Lamana, have appealed from a verdict of conviction and sentence of death, and present their case to this court on bills of exception to the admission of certain testimony, which is made part of the bills, and a bill to the overruling of a motion for a new trial. The prosecution has been conducted upon the hypothesis that on Saturday, June 8, 1907, Walter Lamana, a boy eight years old, was kidnapped from the neighborhood of his home, in New Orleans, taken to the residence of one Ignacio Campisciano, at St. Rose, in the parish of St. Charles, and there murdered, on or about June 12, 1907, and that the kidnapping and murder were the results of a conspiracy in which a number of persons, including the defendants now before the court, were engaged, and the original purpose of which was to extort money from the parents of the boy. The objection (with some slight variation) reserved in bills 1, 2, 5, 7, 8, 9, 11, 13, 14, 15, 16, 18, 19, 22, 23, 25, was :
“That the corpus delicti has not been established, in this: First, that the body found has not been identified as the body of Walter Lamana ; _second, that there has been no evidence of a crime, the crime charged, the crime of murder, and, until the state has established the fact that a murder has been committed, no investigation can be had as to who are the criminals,”
The objection reserved in bills 3, 6, and 24 was that the indictment does not charge conspiracy, and hence that no evidence to establish it, and no statement of other supposed conspirators, and particularly statements made after its consummation, tending to connect the defendants with the conspiracy, should be admitted.
The objections reserved in bills 14, 16, 17,. 21, and 26 were predicated upon both of the grounds thus stated.
The objections reserved in bills 4, 10, 12,. 20, and 27, respectively, were that testimony given under compulsion was inadmissible, that the evidence offered had no connection with the case, that the fact sought to be proved had been ascertained by unlawful means, and (bills 20 and 27) that the testimony was hearsay.
Considered in the order in which the bills are numbered and appear to have been reserved, the ease of the state was presented to the trial court as follows, to wit:
(1) Dr. J. O. O’Hara, coroner of the parish of Orleans, gave testimony to the effect that a certain body, examined by him, was that of a boy from 8 to 12 years old, who had been dead from 10 to 12 days, and tending to> show that the death had been caused by a fracture óf the frontal bone.
(2) John T. Davis, night clerk at the morgue, testified that the body of a boy, 8 or 9 years old, was examined by the coroner, at the morgue, to which place it had been brought by Capt. Capo and others in a patrol wagon, on the morning of June 23, 1907; that a sleeve of the shirt was delivered to-the brother-in-law of AValter Lamana, and the body to an embalmer representing Peter Lamana, the father of Walter Lamana.
*1088 (3) Mrs. Lamana, mother of Walter Lamana, testified: That she last saw her son alive on the afternoon of Saturday, June 8, 1907; that he was about 8 years old; that his brother, Charlie, was between 9 and 10 years old; that the clothing exhibited to her (and which had been identified by the coroner and clerk of the morgue as that which had been removed from the body concerning which they testified) was that worn by Walter when she last saw him, including the sleeve, which had been delivered to her by her son-in-law. She also testified that Mrs. Gebbia, mother of the defendants, lived across the street from her, but had never been to her house, and she had never spoken to her; that' defendant Leonardo Gebbia also lived there; that defendant Nicolina Gebbia lived near by, but spent most of her time at her mother’s; that on the morning (Sunday) after the disappearance of the boy, Mrs. Gebbia came to her' house, as did many others, and told her that the boy was not drowned (witness being apprehensive, at that time, that he might have been lost in that way), but that bad people had him; that she would get a letter demanding money; and that she had better give it or she would never get the boy; that Mrs. Gebbia was the only one who told her that; that she said that was the way they did in her country and spoke of a boy who had been killed because the money demanded had not been paid; that on the following morning (Mionday) the postman brought a letter demanding $6,000; and that the Gebbias, the mother and the two defendants, came over as soon as he delivered it, and Mrs. Gebbia said:
“You see you have got a lettex-.”
(4) Frank Gebbia, a brother of the defendants, being placed on the stand by the prosecution, counsel for defendant stated that they would like to test the competency of the witness by asking a few questions, and the bill (No. 4) contains the following:
“Q. Tour name is Frank? A. Yes, sir. Q. Did you ever have a conversation with Patorno ? A. Yes, sir. By Mr. Lxxzenburg (for the state): As to what do you want to test it? By Mr. Flynn (for defendants): As to his coxxdition of mind in giving his testimony. By Mr. Luzenburg: You mean to say that he is answering under duress; that will be .brought out on cross-examination? By Mr. Flynn: If he is giving his testimony under duress, his testimony is not admissible. By Mr. Flynn: We object. (Objection overruled. Bill reserved, and evidence made part of the bill.)”
The witness testified: That his family— father, mother, brother, married sister, and brother-in-law — and himself lived at 613 St. Philip • street, opposite the Laxnanas; that they keep a lodging house; that he once saw Campiseiano (who is now in the penitentiary) at that house; that he knows Tony Costa and Francesco Luchesi; that he testified in the case against Campiseiano; and that he was forced to do so. The witness admitted that, just before going on the stand, he had told the district attorney, Mr. Luzenberg, and Capt. Capo, that his brother did not go with Angelo Incareaterra, Tony Costa, Tony Gendusa, Lixchesi, and Stephano Monfrey. He was then asked:
“Did you testify in this case, tried here in July, against Campiseiano, Coligero Gendusa, Tony Costa, and Mrs. Campiseiano, in answer to this question, in this way: ‘Your mother, your father-, your brother, Leonardo, and j'our sister, Nicolina, and Incareaterra and Tony Gendusa were together all the time?’ Didn’t you answer ‘Yes?’ ”
To which he replied:
“Yes, I was forced to say that. That’s why I answered that. If I had not been forced, I would know just what to answer. * * * Q. Who forced you? A Judge Patorno forced me. Q. Then, when you testified to that, in this court, in July, in that case against Campiseiano, Gendusa, and Mrs. Campiseiano, you lied, did you? A. Of course, that was a lie. * * * Q. You lied? A. Of course, that was a lie against my brother. * * * Q. Is this the first time you say that Judge Patorno forced you to say that? A. Yes, sir. Q. Did you not say this on that stand: That Friday night, or the night before the child was kidnapped, all of those people whose names I have read, and your bx-other, met that night and put yoxx out. A Yes, sir; I said that. Q. You lied? A. That was a big lie. Q. Don’t you know that thx-ee men and one woman have gone to the penitentiary on your testimony? A. I don’t know if *1090 they went on my testimony. * * * Q. Did you ‘lie then, or are you lying now? A. I am not lying a bit.”
And there was a good deal more testimony of a similar character; the statement, per curiam, in the bill of exception, being:
“The court saw nothing in the manner of the witness to raise the belief that he was testifying under duress. On the trial of four other of the conspirators, before me, the witness freely testified. Whether his testimony was worthy of belief was left to the jury to determine.”
(5) J. 0. Burns was a fellow workman with defendant Leonardo Gebbia in the employ of the Railway & Light Company on Saturday, June 8, 1907, when Walter Lamana disappeared. He testified: That, on that day, Gebbia changed watches with one Benson, so that, instead of being at work during the afternoon and night, he was released at 3:30 o’clock p. m. That, on the next night (Sunday), Gebbia asked him what he thought of the kidnapping of the child, and said, “It is a slick trick.” That, on Monday night, he asked witness to get him a pass to go to Hot Springs; said he was in some trouble, and had to get out. That, on Tuesday night, witness asked him to give up the child, to which-Gebbia replied, “I cannot give you the child unless I get the money.” That, on Wednesday night, witness was told that they were raiding Gebbia’s and went to defendant and told him that his family had made a confession, “that people had turned him up,” whereupon defendant “got as white as a sheet and began to cry.” That, on Saturday night, Gebbia bought a Picayune, and, throwing it to witness, said, “Here, I will get them sons of bitches snatched to death.”
(6) Christopher Santana, or Sentenni, was sworn as an interpreter and translated two anonymous letters, said to have been received by Peter Lamana (father of Walter Lamana), the one on the morning of June 10, 1907, and the other on the following day, demanding $6,000 as the ransom of the boy, directing Lamana where the money should be delivered, threatening the death of the boy and of the entire family in the event of his failing to pay, or calling on the police, etc.
(7) H. Gar iff o (or Julia Gar iff o) testified: That, early upon Sunday morning, in June, 1907, a wagon arrived at Campisciano’s place (St. Rose, in the parish of St. Charles), bringing two men and a little boy; that the little boy, when released from the wagon, ran into the yard, crying; that Campisciano (or Mrs. Campisciano) ran after him and brought him back to the house, smothering his cries by placing a hand over his mouth; that he was put into an outhouse and was heard, in the evening, calling, “Oh, Mamma, Oh, Charlie”; and that some one, going from her house in the direction of the cries, was mot by Mrs. Campisciano, who, being told that they were going to see about the cries, said that it was a little boy “hunting cows,” after which nothing more was heard or seen by the witness of the little boy.
(8) Leo Marrero, deputy sheriff, testified-. That defendant Leonardo Gebbia told him that he had seen Costa entice the Lamana boy away from his house, by showing him a nickel, and lead him for two or three blocks, when he was put into a wagon and carried off by Costa and Monfrey. That Gebbia denied that he knew Campisciano, but was identified by the latter, who called his name as soon as Gebbia was brought into his presence, and this, notwithstanding that Gebbia endeavored, by signs, to make him understand that he was not to do so. That defendant Nicolina Gebbia, on the day before the finding of the body, stated that Luchesi had told her that they had stolen the child and taken it to Campisciano’s, where it had been killed, and Campisciano knew all about it. That, in consequence of the information thus obtained, they ordered a special train, on which they went to St. Rose, on Saturday *1092 night, June 22, 1907, roused Campisciano from his bed, and, under his guidance, found a body partly submerged in the water and partly concealed by the root or limb of a tree, in the swamp about half a mile in the rear of Campisciano’s house. That the body was badly decomposed; the head being detached therefrom. That he and Capt. Capo brought it to New Orleans, where they arrived early on the morning of June 23d. And that Capo carried the body somewhere in a patrol wagon.
(9) John Fitzgerald testified to the arrest of Campisciano and to finding, on his person, a card bearing the address of the Gebbia house,. No. 613 St. Philip street, New Orleans, which card Campisciano attempted, after his arrest, to get rid of.
(10) This bill (No. 10) relates to the same testimony; the ground of objection being that the card had no connection with the case.
(11) Capt. (Thomas) Capo testified: That Campisciano made a statement, following the use of threats and violence, whereupon the witness was requested not to repeat the statement, but to inform the court and jury what was done, by him and others, following the statement, and he said that he and Leo Marrero and several others, having arrived at St. Rose, by special train, brought Campisciano out of his house. That he guided' them to the place where they found the body, half covered with mud and mire, with a large limb of a tree, under which it was lying, almost on top of it. That Campisciano put the body in a box that they had taken with them, and then picked up the head, which was lying alongside, and threw it into the box. That the box and its contents was then carried to the train, and by the train to New Orleans, where it was put into a patrol wagon and delivered at the morgue. That he had, previously (some days before the finding of the body), arrested Leonardo Gebbia, in bed, at his residence, No. 613 St. Philip street, New Orleans, and Gebbia had said that he did not know Campisciano, or Monfrey, or any of the parties supposed to be implicated in the Lamana affair, and that he was at work on the night of the kidnapping. That, about a week before the finding of the body, Nicolina Gebbia had fallen upon her knees and sworn that she knew nothing of the affair, and that none of her family knew anything about it, but that later, when Leonardo was arrested and held in custody, in Gretna, she went there, and, still protesting that her brother was innocent, stated that her lover, Luchesi, had told her that he was going to sell (steal) children to make money, and the next day, came back and told her he did steal a child. Being asked why she had not made her statement in time to save the child’s life, she said she did not want to get into trouble or get her people into trouble. The witness further testified that it was upon the confession of Nicolina that the body was found. The objection reserved in this bill was that the corpus delicti had not been established, etc., as heretofore stated.
(12) This bill (No. 12) relates to the same testimony; the objection reserved being that not only was the statement of Campisciano, superinduced by threats and violence, inadmissible, but that “whatever followed by reason of that statement” was inadmissible.
(13) This bill (No. 13) relates to the same testimony and appears to be predicated upon the same objection as bill No. 11.
(14) Frank Curley testified: That he and Leonardo Gebbia were fellow employés of the Railway & Light Company; that on the Monday or Tuesday evening, following the disappearance of the Lamana child, Gebbia spoke to him about it, and said that the father'could not get the child until he produced $6,000.
“He said, if he had a mind to, he could put his hand on the man who had the boy. Q. He *1094 asked you if you had seen the paper, and then he told you this? A. Yes, sir. Q. As if he was telling you something he had seen in the paper? A. I guess so, may be. Q. Was not that what you judged from what he said? A. He was always shooting hot air, and I told him I did not believe a word he said. By Mr. Luzenburg: Q. He told you, if he wanted to, he could put his hand on the man who had the boy? A. Yes, sir.”
(15) This (No. 15) bill relates to the same testimony as bill No. 14.
(16) Lena Monfrey testified: That her husband owned a horse and wagon; that, upon the Sunday prior to the kidnapping of the child, Leonardo Gebbia and Angelo Incarcaterra came to their place and had a conversation with him, in the street; that, on the Saturday following, in the evening, her husband took his horse and wagon and went off, saying that he was going to work on a banana ship; that he did not return until 12 o’clock the next day; that, on the Wednesday following the day upon which a mass meeting of citizens was held, Gebbia and Incarcaterra came again to her home, at 6 o’clock in the morning, and Gebbia spoke to her husband, after which her husband went out and sold his horse and wagon and went away, since which she has not seen him.
(17) This bill (No. 17) relates to the same testimony as bill No. 16.
(IS) Lawrence Frederico testified: That defendant Nicolina Gebbia was employed by him in his macaroni factory on June 8, 1907, and thereafter, and that on Monday, Tuesday, and Wednesday, following, her brother, Frank, and her sister, Mrs. Monteleone, came to the factory three or four times a day to see her, which was unusual. That, some five or six days after the disappearance of the Lamana child, he asked her about it, and got nothing from her. She denied knowing anything. That, about 10 days later, she was at the jail, in Gretna, where her brother was held in custody, and she then made the statement that Luchesi had told her that they were going to steal children, and the object was to make money; the idea being that she and Luchesi were then to get married. That, she was told that Campisciano and his wife had sworn that they knew nothing about the child, whereupon she said:
“It must come from Campisciano. I am positive that the juice must come out from Campisciano.”
The witness further testified that they, forthwith, obtained a special train and went to Campisciano’s, and that the “child came from Campisciano.”
(19) This bill (No. 19) relates to the same testimony as bill No. 18 and shows that the jury were instructed that it was admitted only as against Nicolina Gebbia.
(20) Ignacio Campisciano, being on the stand, as a witness for the state, had testified (through an interpreter) that he knew Stephano Monfrey, Chico Luchesi, Angelo Incarcaterra, and Tony Gendusa, and that they, or some of them, came to his house and said that they had a wagon in the road. The bill then contains the following:
“Q. Did you see Leonardo Gebbia there? A. That day? No, sir; another day. By Mr. Flynn: We object to the testimony, because it is hearsay. By Mr. Marrero: Q. Ask him what day he saw him, if he saw him there at all? A. Wednesday. Q. Ask him if that was the Wednesday following the day when the other people came there? A. Yes, sir. Q. Ask him if Incarcaterra — ask him who else was there, when Leonardo Gebbia came there? By Mr. Flynn: I want that to be interpreted just as he said, and ask that this testimony be stricken out. By Mr. Luzenburg: What former testimony? By Mr. Marrero: State exactly what he says. A. He was told by the other fellow that Gebbia was on the road. By the Court: The witness can only testify to what he knows. Anything that has been told him by any one else, of course, is not evidence. By Mr. Marrero: Q. Did you see Gebbia there? A. He saw some one on the track, but cannot tell whether it was Leonardo Gebbia or some one else; didn’t go to see. Q. Ask him if he at any time saw Gebbia at St. Rose, before he saw him on Wednesday? A. He was told by other people he was there. By Mr. Flynn: We object to that as hearsay. By Mr. Marrero: Who is the tall man, which man does he mean? A. Joe Luchesi. By the Court: ' I think the exception is made, Mr. Flynn, in conspiracy, that any acts or statements of any of the conspirators are admissible evidence when it tends to show the carrying *1096 out of the common design. The court will allow the testimony in. By Mr. Flynn: To which ruling of the court, counsel for the accused excepts and reserves a bill and makes the answer of the witness part of the exception. By Mr. Luzenburg: The trouble is the objection was made after the question was answered. By Mr. Flynn: I object to what he answered in Italian. By Mr. Luzenburg: Let’s go over it again. We ask your honor to instruct the jury to disregard what has been done and said — to scratch it out. By the Court: It is so ordered. By Mr. Marrero: Did you, yourself, at any time following the bringing of the child to St. Rose, see Leonardo Gebbia at St. Rose? By Mr. Flynn: I object to that as hearsay, and make the answer part of my bill. By the Court: I don’t know what the answer is. By Mr. Flynn: That is why I make the objection. I don’t want the jury to hear the answer. (Bill reserved, and answer made part of bill.) By Mr. Marrero: The question is: ‘Did you see Gebbda at Pecan Grove on such a day?’ You object to the answer. What- is the answer, Mr. Interpreter? By the Interpreter: The judge asked the attorney to put the question, and the answer is that on Wednesday he was told by another fellow that Gebbia was on the railroad, but he did not see him with his own eyes. By Mr. Luzenburg: We won’t insist. By the Court: That is hearsay. He says he was told. Ask him if he saw Gebbia himself. By the Interpreter: A. No, sir; he says he was told by the other people when the people were trying to kill him. By Mr. Marrero: Ask him if he knows who that man was? If he recognized the man who was on the railroad? By the Interpreter: No, sir, he was too far away. He could not recognize him. By Mr. Luzenburg: That objection of Mr. Flynn’s was sustained, of course. By the Court: Yes, sir. Counsel for defendants reserves this his bill of exceptions and makes said testimony part of said bill.”
The statement of the court is:
“This witness spoke Italian, and, as neither the trial judge nor the district attorney nor counsel assisting the district attorney spoke Italian, we had to depend entirely on the interpreter. The questions were legal questions, and did not suggest any hearsay evidence in answer to them. Counsel for defendants did not request to have the jury withdrawn, nor did he state what the answer would be. I could not sustain the objection to the questions, as the questions were legal. I sustained the objection to the answers, as soon as I learned they were hearsay. My instructions, as the bill shows, were: ‘By the Court: The witness can only testify to what he knows. Anything that has been told him by some one else, of course, is not evidence. * * * Counsel for defendants not having asked for the jury to be withdrawn, and not having informed the court what the answer would be, and not having asked for .any additional instructions, I do not see any merit in his exception.’ ”
(21) Charles Hantel testified: That be was a fellow servant with Leonardo Gebbia in the employ of the Railway & Light Company on June 8, 1907. That, a day or two after that, he told Gebbia that they had a mass meeting, and Gebbia said he was afraid to go home; that his brother “had given the whole thing away.” Witness heard him tell Curley “that Lamana had to put up $6,000 before he could get the boy.” He said he knew who had the boy. Gebbia had been on the evening watch, but, on the Friday preceding the Saturday on which the boy was taken, he exchanged with one Benson, and on the Saturday in question he went to work at 7:30 a. m. and knocked off at 3:30 p. m.
(22) J. W. Navarro testified: That, some days after -the Lamana child disappeared, Leonardo Gebbia went to the West End with him and one Haven, and after dinner suggested to them to go North with him, saying that he was disgusted with New Orleans and would pay their fare, though he was then getting something like $100 a month; that witness declined .the offer; and that Gebbia then said he would not go, just then, as it might cause him to be suspected in connection with the St. Philip street affair.
(23) Oscar Sentenny, or Antoine, testified that the body at the morgue was that of Walter Lamana. He was asked, “What was the condition of that body when you saw it?” to which he replied, “In a terrible state, you could make out — mortified.” He was after-wards asked, “That was Walter Lamana?” to which defendants’ counsel made the objection, “He said it was in such a condition he could not say anything about it,” which objection was overruled, and the witness testified that he identified the body by the clothing and the head.
(24) Peter Lamana having testified that his son, Walter, disappeared on Saturday, June 8, 1907, having described the clothing that he wore, having identified that which *1098 the coroner had taken from the body at the morgue as the same, and having also testified that he received a letter on Monday, June 10th, was asked whether he had received any other letter, to which he replied that he had received one on Tuesday, and thereupon counsel for defendants objected, on the ground that no conspiracy had been alleged, etc. The first letter gave Lamana particular instructions as to the delivery of the $6,000 demanded and warned him not to consult the police. He testified that he conformed to the instructions to a certain extent; that is to say, he left his home the next morning and rode up the country, but he consulted the police, and, that evening, he received the second letter, saying:
“We know everything that is going on in your home. Some very good friends of yours keep us on the look out, for if you want your child, the same as he came out from your house, bring the money — $6,000—without any detective with you which are doing all this hunting.”
(25) Philip Geraci, brother-in-law of Walter Lamana, testified that the body at the morgue was that of Walter; that he received a sleeve of the shirt, which he carried to the mother of the boy.
(26) M. Whitney, an embalmer employed by Peter Lamana, testified that the body at the morgue was that of Walter Lamana.
(27) This (bill No. 27) seems to be a duplicate of bill No. 20.
(28) Defendants moved for a new trial on the grounds covered by the bills of exception, and on the further grounds: That it was error to allow the testimony of -Frank Gebbia, given upon another occasion, to be read to him in the presence of the jury, after he had declared that it had been elicited by force and violence. That outside of statements made by her, whilst in jail, there was no evidence to connect Nicolina Gebbia with the crime charged. That the failure to have produced, or to have a return made with regard to, O. Gendusa, summoned as a witness for defendants, operated to defendant’s prejudice. That the jury did not base their verdict, solely, on the law and the evidence; two of the jurors having declared, on voir dire, that they were opposed to capital punishment. This bill recites that the testimony taken in the case is made a part, but, in signing it, the judge says that the testimony was not taken by a stenographer for the district attorney or the court, but for the defense, and hence that it cannot be annexed to the bill unless the counsel for the defense furnishes it. As a matter of fact, the testimony taken on behalf of the state seems to have been furnished, but the minutes.recite the names of several witnesses, as sworn for the defense, whose testimony is not included in the transcript. It may also be stated, in this connection, that there was some evidence adduced on behalf of the state which is included in the transcript only as part of bill No. 28, but which is, more or less, connected with the matters referred to in the other bills.
Thus, the state offered the procés verbal, signed by Dr. O’Hara, of the inquest held at the morgue, June 23, 1907, which recites that the body “viewed” was that of Walter Lamana, and that the cause of death was fracture of the skull. The state also offered the testimony of William Styles, a deputy sheriff, who searched Leonardo Gebbia, after his arrest, and found, on his person, a card bearing upon the back of it, among other things., the name, “Ignacio Oampisciano,” and the address, “St. Rose,” and some other matter so defaced as to be undecipherable, and Styles testified that Gebbia made an effort to recover the card. P. J. Patorno was called and asked whether he had, at any time, intimidated the witness Frank Gebbia, and counsel for defendants objected to his testifying on the subject. Octave Polite, Frank Fratelli, Tony Labella, and Lena Uerchella gave testimony the tendency of which was to show that a man answering the description of Leonar *1100 do Gebbia was seen associating with the other persons supposed, or known, to have participated in the crime here charged, after the kidnapping and about the time of the alleged murder, and other witnesses gave testimony upon other matters, from which it follows that the whole bearing of the objection contained in a particular bill, whether as to the order in which the testimony was given or otherwise, is not always made apparent by the bill.
Opinion.
It will be seen, from the foregoing statement, that the purpose and tendency of the testimony which is made the subject of bills 1 and 2 (that of the coroner and the night clerk at the morgue) was to show that a boy, answering the description of Walter Lamana, ■ was dead, and that he had come to his death, about the time that Walter Lamana was believed to have been killed, by reason of a fracture of the skull. According to the excerpts from the minutes of the trial court (which form part of the transcript), the witnesses aiext sworn on behalf of the prosecution were Oscar Sentenny, Philip Geréssi (or Geraci), M. Whitney, and Mrs. Peter Lamana, and, as we have seen, the sole purpose of the testimony of the first three named was to identify the body (concerning which the coroner and the night clerk had testified) as that of Walter Lamana, and that was also, in paTt, the purpose of the testimony of Mrs. Lamana, who, being on the stand, was also called upon to give certain testimony in regard to the conduct of the defendants just after the ■disappearance of the boy and in regard to the conduct and statements of their mother, in, and out of, their presence.
Whether the jury were satisfied from the testimony of the witnesses named (including that of Mrs. Lamana) that Walter Lamana had been murdered, or whether they would have been, or were, satisfied of that fact from the testimony of the coroner, the derk, and Mrs. Lamana (if we assume that Mrs. Lamana was the third witness examined), we have no means of knowing. Nor is the question, at what time, in the course of a criminal prosecution, and by reason of what evidence, the jury becomes convinced of a particular fact, necessary to their verdict, one into which we can inquire. This court has jurisdiction, in certain classes of criminal cases, “on questions of law, alone,” and is absolutely without authority to determine, in any case, whether a person, alleged to have been murdered, was killed or died a natural death, and the same is true of the trial judge. In the case cited below, it appears that the trial judge had assumed, in his charge, that the deceased had been killed and had used language indicating that he believed the accused did the killing, and, on appeal, it was said by this court:
“It was for the jury to find as a fact that Comeau was killed. It was not for the judge to assume that he was killed. It was for the jury to find, as a further fact, that the killing was by the accused,” etc.
And the conviction was set aside. State v Reed, 50 La. Ann. 994, 24 South. 131.
If, then, there were any rule, known to criminal procedure, to the effect that no evidence tending to connect the accused with the crime charged can be introduced until what is called the corpus delicti shall have first been established, such rule could have no application in this state. Counsel for defendants assumes that, in a ease such as this, the corpus delicti consists of two elements, viz.: the fact of the death of the person alleged to have been murdered, coupled with the criminal agency of some one, as the cause of the death. And, if those facts are to be established before any other evidence is adduced, the question at once presents itself: Who is to determine whether they have been established or not? The Constitution of this state provides that:
*1101 “The jury in all criminal cases, shall be the judges of the law and of the facts on the question of guilt or innocence, having been charged with the law applicable to the case by the presiding judge.”
The trial judge cannot therefore determine whether the deceased has been killed, or died a natural death, and, as the matter must be determined by the jury, the question remains: How is the trial judge to know, whether, or when, that fact has been established to the satisfaction of the jury? It is true that the corpus delicti should be established, beyond all reasonable doubt, as an element in, or as the basis of, every conviction; but, whilst there is quite a difference of opinion as to what constitutes the corpus delicti, the authorities are generally agreed that the order in which the proof is to be made, in any case, is-left to the party making it, subject to a certain discretion, vested in the trial judge. In one law dictionary, we find 'the following:
“Corpus Delicti: The body of the offense; the essence of the crime. It is a general rule not to convict unless the corpus delicti can he established; that is, unless the fact that the crime has actually been perpetrated has _ first been proved. Hence, on a charge of homicide, the accused should not be convicted unless the death be first distinctly proved. * * * In case of felonious homicide, the corpus delicti consists of two fundamental and necessary facts: First, the death; and, second, the existence of criminal agency as its cause. Pitts v. State, 43 Miss. 472.” Black’s Law Dictionary. (Italics by the court.)
In another, we find:
“Corpus Delicti: The body of the offense; the substance of the crime; the substantial and fundamental fact of the commission of the crime. The general rule is there can be no conviction for crime unless the corpus delicti is established ; that is, unless the fact that the crime has been actually perpetrated has been proved. Thus, one accused of homicide cannot be convicted unless the death be first distinctly proved.” Abbott’s Law Dictionary. (Italics by the court.)
In another:
“Corpus Delicti: The body of a crime. The body (material substance) upon which a ci'ime has heen committed, e. g., the corpse of a murdered man; charred remains of a house burned down. In a derivative sense: The substance or foundation of a crime; the substantial^ fact that a crime has been committed.” Bouvier’s Law Dictionary. (Italics by the court.)
Another authority says:
“The idea and the rule is * * * that a person shall not be convicted of having killed a person until it is proved that the person is in fact dead. When that is made out, the corpus delicti is made out; that is, the subject-matter of the alleged crime, namely, a person dead. State v. Potter, 52 Vt. 33-39.” 3 AVigmore on Evidence, page 2782. (Italics by the court.)
The learned author last above quoted, after referring to the rule that a person charged with crime should not be convicted on his uncorroborated confession, until the corpus delicti has been established, says:
“The meaning of the phrase corpus delicti has been the subject of much loose judicial comment, and an apparent sanction has often been given to an unjustifiably broad meaning. It is clear the analysis of every crime with reference to this element reveals three component parts: First, the occurrence of the specific kind of injury or loss (as in homicide a person deceased; in arson, a house burnt; in larceny, property missing); secondly, somebody’s criminality as the cause of the loss (these two together involving the commission of a crime, by somebody); and, third, the accused’s identity as the doer of the crime. (1) Now the'term ‘corpus delicti’ seems, in its orthodox sense, to signify merely the first of these elements, namely, the fact of the specific loss or injury sustained. * * (2) But by several judges the term has been said to include the second element also. * * * This broader form makes the rule (referring to the rule as to the uncorroborated confession) much more difficult for the jury to apply amid a complex mass of evidence, and tends to reduce the rule to a juggling formula. (3) A third view, indeed too absurd to be argued with, has occasionally been advanced, at least by counsel, namely, that the corpus delicti includes the third element also, i. e., the accused’s identity as the criminal. * * * To illustrate the different definitions by the various crimes, it would follow, under the orthodox definition, that, in homicide, the fact of death, whether or not feloniously caused, is the corpus delicti. Volume 3, § 2072. That the evidence of the corpus delicti should be put in befor'e the confession is certainly good practice, and is occasionally said to be the rule; but the better view is that the trial judge may determine the order of the evidence on the general principles otherwise prevailing.” Id. § 2073.
As to the general rule, or principle, with respect to the order in which evidence is to be introduced, the same author says:
*1104 “Thus, the fundamental rule, universally accepted, is that, with reference to facts whose relevancy depends upon others, the order of presentation is left to the discretion of the party himself, subject, of course, to the general discretion of the trial court in controlling the order of evidence.” Id. 1871. “The order of evidence is, in general, left to the determination of the trial court.” Id. 2038.
Another author, in dealing with the subject of the corpus delicti, after referring to the deplorable condition resulting from an execution for the murder of one who after-wards appears in the flesh, says:
“To guard against it, the judges long ago invented the doctrine of the corpus delicti, by which, says Starkie, ‘the accused shall not be convicted unless the death be first distinctly proved either by direct evidence of the fact, or by inspection of the body. * * * ’ And ‘even when the body has been found, and although indications of a violent death be manifest, it shall be fully and satisfactorily proved that the death was neither occasioned by natural causes, by accident, nor by the action of the deceased himself.’ * * * But the doctrine has, at least in later times, been regarded rather of caution than of absolute law.” 1 Bishop on Or. Pr. § 1056.
Referring to the rule on the subject of the relation between the corpus delicti and the uncorroborated confession, the same author says:
“On the whole, the doctrine may be said to be that special care should be exercised as to the corpus delicti, and there should be no conviction except where this part of the case has been proved with particular clearness and certainty. Hence the rule as to purely uncorroborated confessions. out of court alone; they are never quite satisfactory proof, which the evidence, whether circumstantial or direct, must be, to establish the corpus delicti. This is the substance of the doctrine, but some judges spin it a little more finely.” Id. 1058.
In regard to the order of proof, the same author says:
“The same usages, as to the order in which the evidence shall be presented, prevail in criminal cases as in civil. One, for example, who has closed his testimony and rested, can, ordinarily, introduce further evidence only in rebuttal. But, on this question and all others relating to the order of the evidence, the general rules yield to the justice of the particular case; in other words, it is competent for the presiding judge to permit any departure from them in his discretion the cause of justice may require.” Id. § 966. “Practical convenience is, in most instances, promoted by having each witness deliver all he knows of the issue at one examination, while a part may be irrelevant unless something, not yet proved, is assumed. Thereupon the presiding judge may, in his discretion; accepting the assurance of counsel that the missing link will be supplied, receive, now, what such assumption, alone, would make relevant. If the further proof fails, what is thus given is stricken out, and the jury is directed not to regard it. A general practice of receiving evidence and Afterwards excluding it, by instruction, is vicious and, it may be, even erroneous; nor will considerations of convenience always, as of course, induce the court to receive evidence otherwise than in its natural order, wherein one fact leads to. and supports, another. All is within the judicial discretion.” Id. § 966.
Our conclusion upon the question under consideration, then, is that, whilst, in a prosecution for murder, before there can be a legal conviction, the death of the person alleged to have been killed, together with the criminal agency of some one, as the cause of the death, must be established, beyond reasonable doubt, and whilst it is, ordinarily, better practice to make proof, at least of the death, in the opening of the case, neither the common law nor any statute of this state requires that those facts, or either of them, shall be established as a condition precedent to the introduction of evidence tending to connect the accused with the crime charged; the order in which the proof is to be administered being, in general, left to the discretion of the trial judge.
Upon the subject of the admissibility of the evidence referred to in some of the bills, to prove conspiracy, in the absence from the indictment of a specific charge of conspiracy, and of the admissibility of statements of supposed conspirators, not on trial, in furtherance of the conspiracy, against the defendants, the rule stated by this court, and sustained by authority, is that an indictment, charging several persons, jointly, with the commission of a murder, involves a conspiracy, and hence the proof of the latter may be admitted without its being formally charged *1106 (State v. Ford, 37 La. Ann. 459), and that, where the conspiracy is to be established by inferences drawn from a number of facts and circumstances, the order of proof is discretionary with the court, and evidence of the acts and declarations of the supposed conspirators may be admitted at any time, dependent, finally, for effect; under the charge of the judge, upon the ultimate establishment of the conspiracy, and of the accused’s connection therewith, to the satisfaction of the jury (State v. Bolden, 109 La. 484, 33 South. 571; Wharton’s Cr. Ev. [9th Ed.] §§ 698, 700, 701; 12 Cyc. pp. 437, 435).
Whether, In any case, a conspiracy has been established, is a question of fact for.the jury. If the jury, eventually, find that it has been established, and that the defendant on trial was engaged in it, they are at liberty to give such weight as they think proper to the testimony, tentatively admitted, as to the sayings and doings of the conspirators, out of the presence of each other and in furtherance of the common purpose; the question being, “not who has been indicted, or who is being tried, but who, with a community of purpose, participated in the crime.” If the jury eventually find that a conspiracy has not been established, such testimony should not be considered to the prejudice of the accused, and the jury should be so instructed. In the instant case, the trial judge, apparently, predicated certain of his rulings upon the belief that a conspiracy had been proved, but he charged the jury (and no bill of exception was reserved to the charge or to any failure or refusal to charge):
“Xou are to judge, from the evidence, whether you are satisfied, beyond a .reasonable doubt, that a conspiracy has been established. * * * The evidence must satisfy you that the accused acted in the commission of the crime. Still, it is not necessary that it should be proved, positively, that they all met together and agreed to commit the crime. Such an act may be proved by circumstance. And if, from all the evidence, the jury is satisfied that the crime was committed by one or more of the defendants (conspirators), and the prisoners at the bar acted in the commission of the crime, each aiding in his own way, it is all the law requires to make them all guilty.”
The statement made by Mrs. Gebbia, out of the presence of the defendants, and testified to by Mrs. Lamana, it may be remarked,, did not tend to implicate the defendants; the significance of Mrs. Lamana’s testimony, so far as the defendants were concerned (if the jury considered it significant), lying in the-fact that it showed that defendants, as well as their mother, displayed an interest in ascertaining the effect of the letters demanding money for the return of the missing child, nor did the letters bear upon the defendants, save in so far as they became connected with them by their own acts. They were merely facts tending to sustain the hypothesis of the prosecution that a number of persons had conspired to kidnap the Lamana child, in order to extort money, and had, subsequently, murdered him, in order to get him out of the way, when the original scheme failed; the relevancy of the letters being governed: by the rule as thus stated, to wit:
“Belevancy is, therefore, to be determined by free logic, unless otherwise settled by statute or controlling principle. All facts that go either to sustain or impeach a hypothesis are admissible.” Wharton’s Or. Ev. (9th Ed.) § 24.
All the other testimony, objected to on the ground that no conspiracy had been charged or proved, related directly to the acts and statements of the defendant Leonardo Gebbia himself, and did not tend to implicate Nicolina Gebbia, save as she might, or might not, be otherwise shown to have been a party to the supposed conspiracy. We therefore conclude that the objections that evidence offered to connect the defendants with the crime charged, and with a conspiracy to commit such crime, was not admissible, because the indictment contains no charge of conspiracy, and no conspiracy was proved, were properly overruled. There is. *1108 nothing in bill No. 4, or in the testimony of Frank Gebbia, made part thereof, to indicate that the witness was testifying under any sort of duress. The fact that he stated that he had previously given testimony under compulsion, and that, in so doing, he had testified falsely, suggested the contrary idea.
The testimony of Fitzgerald (referred to in bill No. 10), to the effect that he found a card, with the address of the Gebbias upon it, on the person of Gampisciano, and that the latter attempted to make away with it, tended to sustain the hypothesis of the prosecution that Campisciano knew, and was known to, the Gebbias, and to contradict the statements to the contrary attributed to Leonardo Gebbia, and the trial judge properly ruled that the objection went to the effect.
The objections (reserved in bill No. 12) to the testimony of Thomas Capo, as to facts knowledge of which was obtained from Campisciano by threats or violence, was properly overruled. Facts, discovered in consequence of confessions improperly obtained, may, if relevant, be proved. Reynolds’ Stevens on Ev. (8d Ed.) page 42; Underhill on Circum. Ev. § 138; Wigmore on Evidence, §§ 858, 859.
The objection reserved in bills 20 and 27 was also properly overruled. The question asked the witness was whether he had seen Leonardo Gebbia at St. Rose, and it does not appear that either the state’s attorney or the court had any reason to suppose that he would answer (as he did) that he had not seen him, but was told that he was there. On the other hand, defendants’ counsel seemed to have had some reason to expect an answer of that kind, since he objected before the answer was given, on the ground that it was hearsay. We are of opinion that he should have given the Court the benefit of his information and have asked that the jury be retired until the character of the answer could be ascertained. As it was, the court instructed the jury, in effect, that the hearsay statement of the witness was not evidence, and defendants’ counsel asked for nothing more. The complaint, now made, that the impression created upon the minds of the jurors was not removed by the instructions so given, cannot avail. The results of a criminal trial cannot be defeated by reason of hearsay testimony, volunteered by a witness, which the jury is instructed to disregard.
The grounds 1, 2, and 3, stated in the bill 28, to the overruling of the motion for new trial, have been considered. The grounds 4, 5, 6, and 7 are not otherwise presented than by the motion and bill in question, which do not establish a sufficient basis for their consideration in this court.
For the reasons thus assigned, the- judgment appealed from is affirmed.