410 So.2d 1019 (1982)
STATE of Louisiana
v.
Robert Lee WILLIE.
No. 81-KA-0242.
Supreme Court of Louisiana.
January 25, 1982.
Rehearings Denied March 19, 1982.
*1023 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Marion B. Farmer, Dist. Atty., Herbert R. Alexander, Jr., Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
S. Austin McElroy, Covington, for defendant-appellant.
DENNIS, Justice.
The defendant, Robert Lee Willie, was convicted of first degree murder and sentenced to death. He appeals from his conviction and sentence, urging fifteen assignments of error.
On May 28, 1980, at approximately 4:30 a. m., Robert Lee Willie and Joseph Vaccaro offered a ride to the victim, Faith Hathaway, outside of the Lakefront Theatre, a disco in Mandeville, Louisiana. Miss Hathaway, an 18 year old woman, had been celebrating her last night as a civilian before entering the United States Army. Instead of taking the victim to her home in St. Tammany Parish, as she had requested, Willie and Vaccaro took Hathaway to Fricke's Cave, a heavily wooded, secluded gorge south of Franklinton in Washington Parish. Willie or Vaccaro, or both, raped the young woman there. Afterwards, one of the men repeatedly stabbed the victim in the throat while the other held her hands. Hathaway's clothes and purse were found approximately one hundred fifty yards from her body on June 1st, 1980. Her body was discovered on June 4, 1980.
On June 3, 1980, Willie and Vaccaro were arrested in Hope, Arkansas for unrelated crimes of aggravated rape, aggravated kidnapping and attempted murder committed against persons other than Hathaway. On June 10, 1980, both defendants admitted to police officers that they seized Hathaway but each accused the other of raping her and slashing her throat.
A. TRIAL OF GUILT OR INNOCENCE
ASSIGNMENTS OF ERROR NOS. 1 and 2
The defendant contends that the trial court erred in failing to order a venue change pursuant to La.C.Cr.P. arts. 621 et seq. In rejecting the motion for a change of venue, the trial court apparently found that the defendant failed to carry his burden of proving "that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending." La.C.Cr.P. art. 622; State v. Bell, 315 So.2d 307 (La.1975).[1] Although *1024 the trial court possesses a broad range of discretion in this area, see, e.g., State v. Adams, 394 So.2d 1204 (La.1981); State v. Felde, 382 So.2d 1384 (La.1980); State v. Sonnier, 379 So.2d 1336 (La.1980), we are required to make an independent evaluation of the facts to determine whether the accused received a fair trial, unfettered by outside influences. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In our review, however, we have the benefit of a completed trial record. The record demonstrates that counsel for the defendant conducted a thorough voir dire of the prospective jurors. Of the fifty-two prospective jurors, forty-seven had read or heard about the case. However, only ten of the fifty-two said they had formed any opinion as to the defendant's guilt or innocence. Four of those testified that they could set aside that opinion and render a verdict based on the evidence presented at trial. The court sustained challenges for cause as to those six who had formed an opinion but who were unable to lay their preconceived opinion aside. In addition, the defendant exercised his privilege of challenging twelve other prospective jurors peremptorily. We believe that the qualifications possessed by each selected juror met or exceeded the minimum requirement that "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). In the instant case, the jury selection procedure resulted in the seating of a jury consisting of five women and seven men. In addition, the jury verdict in Joseph Vaccaro's case, which was tried simultaneously and in the same parish, reflects some degree of discernment in assessing the evidence, since the jury recommended a penalty of life imprisonment without parole for Vaccaro, whose complicity in the crimes was equal to that of Willie insofar as it was reflected by the pretrial news coverage. The record shows that the great bulk of publicity consisted of straight news reporting, which occurred nearly two months before the trial. The extent to which governmental officials were responsible for the publication of objectionable matter about the case was minimal. The district attorney was quoted as stating that he would personally conduct the prosecution to make sure that "these two animals" would not walk the streets again. This prejudicial remark was very brief, however, and had probably lost whatever force it had by the time of trial. Although the crime was vile and outrageous, and was thoroughly covered by the area news media, it was not attended by other inflammatory factors such as racial strife, see State v. Bell, 346 So.2d 1090 (La.1977), murder of law enforcement officials, State v. Felde, 382 So.2d 1384 (La.1980) or an egregious event such as a televised confession. See Rideau v. La., 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). On the contrary, the defendant and the victim were of the same race, and neither was a resident of the parish in which the crime occurred and the trial was held. From our independent review of the facts, we are convinced of the correctness of the trial court's ruling on this issue.
ASSIGNMENT OF ERROR NO. 3
By this assignment defendant contends the trial court erred in denying his *1025 motion for sequestration of jurors during voir dire, although he permitted individual questioning of the prospective jurors. The manner in which the veniremen are called and the scope of the examination are left to the court's discretion. La.C.Cr.P. art. 784; Id. comment (c); art. 786. The burden is therefore on the defendant to show that the court misused its discretion in refusing to sequester the venire during voir dire. State v. Monroe, 397 So.2d 1258 (La.1981); State v. Berry, 391 So.2d 406 (La.1980); State v. Dominick, 354 So.2d 1316 (La.1978). Because the defendant has failed to show any misuse of discretion, this assignment is without merit.
ASSIGNMENT OF ERROR NO. 4
By this assignment defendant argues that the trial court erred in denying his motion for continuance filed four days before trial. Defense counsel was alloted one hundred nine days from his appointment and at least thirty-nine days from the fixing of the case for trial for preparation. He complains he received some amended discovery responses from the district attorney only four days before trial and that he was notified only one month before trial that the state would definitely try the murder case on that date as opposed to unrelated rape charges. Defendant has failed, however, to show how these inconveniences prevented adequate preparation for trial. Since it is within the trial court's discretion to grant a continuance and to judge if there is good ground therefore, La.C.Cr.P. art. 712, this assignment is without merit.
ASSIGNMENT OF ERROR NO. 5
By this assignment defendant charges that the trial court erred in denying his motion to have him transferred to the Washington Parish or St. Tammany Parish jail four days before trial and during trial to facilitate the assistance of counsel in his defense. During the brief hearing on the motion, at which only arguments were presented, the trial judge was presented with these contentions: Defendant was incarcerated in a federal facility in New Orleans where he would be available to defense counsel on weekends and after hours. The Washington Parish jail was already filled to its maximum capacity. During trial the defendant was to be brought to Washington Parish for court each day and returned each night to New Orleans under guard by federal marshals. The travel time one way from defendant's place of incarceration to the courthouse was approximately two hours. The trial judge resolved the problem by assuring defense counsel that, in addition to having defendant made available to him in New Orleans, the court would arrange for further conferences if necessary before the defendant was returned to the federal penal facility on days during the trial. This is the type of question which appropriately lies within the trial court's discretion because of the impracticability of framing a rule of decision where many disparate factors must be weighed. See State v. Talbot, 408 So.2d 861 (La.1980) (on rehearing); Noonan v. Cunard Steamship Co., 375 F.2d 69, 71 (2d Cir. 1967). The trial judge's solution to this particular problem appears to be reasonable, workable, and a proper exercise of his discretion. Defendant did not object during trial or present evidence that the procedure outlined by the trial court prevented adequate consultation with counsel. Accordingly, this assignment is without merit.
ASSIGNMENTS OF ERROR NOS. 6 and 7
Defendant asserts that the trial court erred in making certain statements of law during the voir dire. Defendant further asserts that the trial court erred in not granting a mistrial as to these statements upon a defense motion to do so.
The trial judge made the following statements:
Now if the state does prove in presenting their case guilt in your mind beyond a reasonable doubt, then you would legitimately expect something else, but it all depends on the state's proof, not on what the defense puts up.... what you weigh is the state's evidence. The state has the *1026 burden. They present their case first, and if from the evidence which they have presented, they have failed to prove something that is necessary in order to obtain guilt, then at that time the defense has the right not to put on anything, just to rest on the inadequacy of the state's case....
What you're doing is weighing the state's case. You don't weigh the defendant's case until after you weigh the state's case. They have the burden to carry out proof. If they fail to do it, then he doesn't have to do anything, because of this rule of presumption of innocence, you see. Now, if they do it, you might expect something else. The first thing [defense counsel objects].... The state has to prove its case beyond a reasonable doubt, and if you feel like they have not done that after they present their case, then he would be entitled to a verdict of not guilty; in other words, you weigh the evidence presented by the state before you expect anything. Can you do that?
You would not necessarily expect him to do anything, you would weigh the evidence of the case of the state as to what they presented.
La.C.Cr.P. art. 770, which codifies the jurisprudential rules with reference to prejudicial remarks that could form the basis of a mistrial, provides in pertinent part as follows:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(3) The failure of the defendant to testify in his own defense;
* * * * * *
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
The judge's remarks did not refer directly or indirectly to the failure of the defendant to testify in his own defense. It came dangerously close. But our careful scrutiny convinces us that the comment was intended to inform the jury that the state must prove the defendant's guilt beyond a reasonable doubt, regardless of whether the defendant presents any evidence, and that the average juror would not have inferred from it a reference to defendant's failure to testify. This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 8
Defendant argues that the trial court erred in not granting the motion to suppress his confession. It is defendant's contention that the statement he gave to authorities was given involuntarily and in violation of his Miranda rights.
On June 3, 1980, Special Agent Lambert of the FBI and Lieutenant Duvall of the Arkansas State Police advised the defendant of his constitutional rights in Hope, Arkansas, after his arrest there on unrelated aggravated rape, aggravated kidnapping, and attempted murder charges. The defendant was not interviewed on that date because he refused to answer questions without a lawyer being present. On June 4, 1980, Willie was taken to Texarkana, Arkansas and again advised of his right to an attorney by a United States Magistrate, who read charges against him and set bond. The defendant waived his right to an attorney for purposes of that hearing and informed the United States Magistrate that he had an attorney in Louisiana but did not request his presence.
At the motion to suppress hearing, FBI agent Lambert testified that on June 11, 1980, he received a call from one of Willie's jailers informing him that on June 9, 1980, the defendant had requested to speak to Lambert. On June 10, 1980, Investigator Michael Varnado of the Washington Parish District Attorney's Office and Sergeant Donald Sharp of the St. Tammany Parish Sheriff's Office interviewed Willie at the *1027 jail in Texarkana, Arkansas regarding the Hathaway murder and rape. Sergeant Sharp testified that, before the interview, he fully advised Willie of his constitutional rights and that the accused expressly stated that he did not want the assistance of an attorney. Willie was then informed that his co-defendant, Vaccaro, had just given an oral statement to Varnado and Sharp in connection with the Hathaway murder. Investigator Varnado informed the defendant that his mother had been arrested for harboring him but that in his opinion the charges would be dismissed if further investigation revealed they had no merit. Nevertheless, the officers testified that no promises of any kind were made to the accused. Willie gave them an oral statement and a tape recorded statement which he signed after it was transcribed. Willie did not testify at the motion to suppress hearing or present any evidence to controvert the officers' testimony.
These events raise the questions of (1) whether Willie knowingly, voluntarily and intelligently waived his right to counsel and his privilege against self-incrimination; and (2) whether his confession was free and voluntary.
The United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), set forth procedures to insure that an individual subject to custodial police interrogation is accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself. These included the following: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.[2] Unless other fully effective measures are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be informed that he has a right to remain silent, that any statement he does make may be used in evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently. "If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." Id. 384 U.S. at 444, 86 S.Ct. at 1612. At another point in the opinion, the court declared, "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 474, 86 S.Ct. at 1627.
Article I § 13 of the 1974 Louisiana Constitution requires that any person arrested or detained in connection with the investigation or commission of any offense must be advised fully of the reasons for his arrest or detention, his right to remain silent, his right against self-incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel. By the adoption of this provision, Louisiana enhanced and incorporated the prophylactic rules of Miranda v. Arizona. In Re Dino, 359 So.2d 586 (La.1978).
In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the high court made clear that when an accused has invoked his right under Miranda to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. An accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further *1028 communication, exchanges or conversations with the police. Ibid.
Six months before the decision in Edwards v. Arizona, this court, in State v. Thucos, 390 So.2d 1281 (La.1980), reached a similar conclusion. In that case we held that after an accused invoked his right to have counsel present during custodial interrogation, the police failed in their duty to scrupulously honor his right when they initiated further questioning shortly after his request for counsel. The accused did not have an attorney present although he had not withdrawn his request for one.
Although the per se rule against further interrogation after a request for counsel appears at first blush to have direct application in the present case, we conclude that it is inapposite after careful examination of the reasons underlying Miranda. First, in announcing the procedural safeguards, the Miranda court declared they were to be employed "unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it...." 384 U.S. at 444, 86 S.Ct. at 1612. The court noted that Rule 5(a) of The Federal Rules of Criminal Procedure, and its effectuation of that rule in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), requiring production of an arrested person before a commissioner without unnecessary delay and excluding evidence obtained in default of that statutory obligation, were responsive to the same considerations of Fifth Amendment policy that faced the court in Miranda as to the States. Since Willie was brought before a federal magistrate who informed him of his rights and offered to appoint counsel for him in compliance with the supervisory rules, his privilege under the Fifth Amendment was protected by "other effective means" as required by Miranda. Second, Miranda is not to be read to impose an absolute ban on resumption of questioning at anytime or place on any subject. See, Michigan v. Mosley, 423 U.S. 96, 115, 96 S.Ct. 321, 332, 46 L.Ed.2d 313, 328 (1975) (Brennan, J., dissenting). For example, in discussing the Westover case, the Miranda court indicated that improper interrogation by one law enforcement agency would not necessarily bar questioning about a different crime by a legally distinct authority.[3] 384 U.S. at 496, 86 S.Ct. at 1639. Also, the high court cited with approval the FBI practice of terminating interviews upon receiving a request for counsel except "as to all matters other than the person's own guilt or innocence." 384 U.S. at 485, 86 S.Ct. at 1633. Finally, under the unique circumstances of this case, Willie's refusal to answer the FBI agent's questions about federal crimes without an attorney should not be construed as a per se invocation of his Fifth Amendment rights as to independent state offenses requiring all interrogation as to the latter to cease. The Miranda court sought to formulate protective devices to dispel the compulsion inherent in custodial interrogations, which have largely taken place incommunicado. 384 U.S. at 457, 86 S.Ct. at 1618. There is no indication in the record that Willie was held incommunicado. When he asked not to be questioned without an attorney about the federal crimes by the FBI agent, his right was scrupulously honored. There was no reason for him to believe the Louisiana officials would behave differently. He was specifically asked by the state officers if he wanted an attorney present and he expressly waived this right. By the time the state officers approached Willie, one week had elapsed since the FBI agent attempted to interview him, Willie had been removed from his original surroundings, he had appeared before a federal magistrate, and he *1029 had voluntarily signalled his willingness to discuss his crimes with law enforcement authorities. For all of these reasons, we conclude that Willie was under no pressure to answer questions about the state crimes without the presence of an attorney, but that he did so knowingly and intelligently after being fully advised of his rights and given an opportunity to exercise them.
Moreover, even if the Edwards v. Arizona rule is applicable here, after Willie first refused to answer questions by the FBI agent without the presence of counsel, he himself initiated further communications with both federal and state law enforcement officials. Although the evidence indicates he initially asked to talk to the FBI agent, the record contains no suggestion that he was in any way reluctant to talk to all law enforcement officials.
The general rule is that, on the trial of a motion to suppress, the burden of proof is on the defendant to prove the grounds of his motion. La.C.Cr.P. art. 703(D). One exception to the rule is that the State has the burden of proving beyond a reasonable doubt the voluntariness of a confession which the defendant has moved to suppress as evidence at the trial on the merits. La. C.Cr.P. art. 703(D); La.R.S. 15:451; State v. Glover, 343 So.2d 118 (La.1977); State v. Johnson, 363 So.2d 684 (La.1978); State v. Bouffanie, 364 So.2d 971 (La.1978); State v. Volk, 369 So.2d 128 (La.1979); State v. Jones, 376 So.2d 125 (La.1979). In reviewing the trial judge's ruling as to the admissibility of a confession, his conclusions on credibility are entitled to the respect due those made by one who saw the witnesses and heard them testify. State v. Bouffanie, supra.
In the present case, Willie did not testify at the suppression hearing or trial. Each law enforcement officer who testified stated that no promises, threats, or coercion of any kind was used on Willie. Investigator Varnado informed Willie that in his opinion, if the charges aginst Willie's mother were without merit, they would be dismissed. However, Varnado testified that he made no promises to Willie.
Willie was in jail for one week prior to his giving of the statement. It is uncontradicted, however, that no authorities questioned him during this time. Before Willie confessed, he had been advised of his rights on at least three occasions, a federal magistrate had offered to appoint an attorney for him, and he had declined stating that he had a lawyer in Louisiana. It does not appear from the evidence that Willie's will was overborne. His inculpatory statement appears to have been made freely and voluntarily. Accordingly, this assignment of error is without merit.
ASSIGNMENTS OF ERROR NOS. 9 and 10
Defendant argues that the trial court erred in finding that the State proved the corpus delicti of the crime charged to such a degree that the jury could find that the corpus delicti had been proven beyond a reasonable doubt. Based upon this alleged error, the defendant urges that the trial court also erred by admitting into evidence the defendant's confession.
It is well settled that an accused party cannot be legally convicted on his own uncorroborated confession without proof that a crime has been committed by someone; in other words, without proof of the corpus deliciti. State v. Ashley, 354 So.2d 528 (La.1978); State v. Mullins, 353 So.2d 243 (La.1977); State v. Freetime, 334 So.2d 207 (La.1976); State v. Sellers, 292 So.2d 222 (La.1974); State v. Brown, 236 La. 562, 108 So.2d 233 (1959); State v. Calloway, 196 La. 496, 199 So. 403 (1940); State v. Morgan, 157 La. 962, 103 So. 278 (1925). The corpus delicti must be proven by evidence which the jury may reasonably accept as establishing that fact beyond a reasonable doubt. State v. Carson, 336 So.2d 844 (La.1976); State v. Brown, supra; State v. Morgan, supra. In a prosecution for murder, before there can be a legal conviction, the death of the person alleged to have been killed, together with the criminal agency of someone as the cause of the death, must be established beyond reasonable doubt. State v. Gebbia, 121 La. 1083, 47 So. 32 (1908).
*1030 Although the body of the deceased was partially decomposed upon its discovery, the death of Faith Hathaway was firmly established by the evidence. The medallion found around the neck of the victim by Dr. McGarry, the pathologist who performed the autopsy, was matched to a photograph of Hathaway wearing the medallion. Other items of evidence found near the body of the victim were identified as her belongings, including her driver's license and birth registration card. The victim's uncle, Dr. Donald Trewick, a dentist, inspected the body, compared the deceased's dental restorations with Faith Hathaway's dental records. He concluded that the teeth he examined at the funeral home were Faith Hathaway's teeth.
Dr. McGarry, who performed the autopsy, testified that he felt that a large slash-like opening in the soft tissues in the front of the neck extending all the way across the neck was probably the fatal wound. He also concluded that a deep wound of the right hand was probably due to an attempt at defense against the wound in the neck. A vaginal laceration indicated to him that forceful intercourse had taken place at about the same time. The evidence further established that Hathaway's nude body was found in a remote area and that no object which could have caused the wounds was found at the scene. This evidence established beyond a reasonable doubt that Faith Hathaway's death was caused by the criminal agency of someone. Hence, the corpus deliciti was established independently of defendant's confession, and these assignments of error have no merit.
ASSIGNMENTS OF ERROR NOS. 11, 12 and 13
After both the State and the defendant rested their cases, the defendant moved for a mistrial contending that the prosecution had in its possession a note found at the scene of the crime which may have constituted exculpatory evidence which the State failed to disclose in response to a general Brady request. The court denied the motion. Defense counsel asked the judge, "Would you inspect it?" The trial court replied that he would inspect and consider it on a motion for a new trial. Defense counsel did not specifically request an inspection of the note or move the court to order the district attorney to produce it for inspection by the defendant or the court.
In brief in this court the state and the defendant assert that the note contains the words "you will never catch us" or "you never find her." The prosecution contends that the note was discovered three days after the body was found, that it was probably left by a prankster, and that it constitutes neither inculpatory nor exculpatory evidence.
The defendant's right to be protected against the prosecution's failure to disclose exculpatory evidence is founded upon the due process clause and is designed to assure a fair trial and not to deter prosecutorial misconduct. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); 8 Moore's Federal Practice § 16.06 (2d ed. 1981). In United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court set forth three categories of cases to which Brady arguably applies and enunciated standards for each category.
The first category is illustrated by Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), and includes cases in which the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecutor knew, or should have known, of the perjury. A strict standard of materiality is applied in such cases and a conviction obtained by the knowing use of perjury must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury". United States v. Agurs, supra 427 U.S. at 103, 96 S.Ct. at 2397.
The second category of cases, typified by Brady itself is characterized by a pretrial request for specific evidence. The standard for materiality in such cases is whether the suppressed evidence "might have affected the outcome of the trial." *1031 United States v. Agurs, supra, 427 U.S. at 104, 96 S.Ct. at 2397.
The third category of cases consists of those in which a general request ("all Brady materials") or no request at all is made. A conviction will be overturned, in such cases, if the omitted evidence creates a reasonable doubt that did not otherwise exist. The omission must therefore be evaluated in the context of the entire record.
If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.
United States v. Agurs, 427 U.S. at 112-13, 96 S.Ct. 2401.
In the instant case there was no specific pretrial request for the undisclosed evidence. Even if we construe the defense counsel's motion for a mistrial as a specific request for the evidence, it did not come until after both parties had rested their cases. Accordingly, this case falls in the third category and presents the question of whether the omitted evidence creates a reasonable doubt that did not otherwise exist.
The defendant reurged this assignment of error in his motion for a new trial. The motion was denied, however, and apparently without affording defendant an opportunity to inspect and analyze the note or to make a showing that "the defense might have made effective use of the [note] at the trial or in obtaining further evidence". Giles v. Maryland, 386 U.S. 66 at 74, 87 S. Ct. 793 at 797, 17 L.Ed.2d 737. See, State v. Henderson, 362 So.2d 1358 (La.1978); 8 Moore's Fed. Practice § 16.06[3] p. 16-137.
Because defendant has never been given such an opportunity, and because the note is not part of the record in this case, we will remand the case to the trial court for it to determine, in the light of this opinion, whether the note, used as evidence or otherwise at trial, or further evidence gained from the note's inspection and analysis, would, upon its evaluation in the context of the entire record, create a reasonable doubt as to the defendant's guilt.
ASSIGNMENT OF ERROR NO. 14
By this assignment defendant argues that the trial court erred in denying his motion for a new trial. The motion is based for the most part on the 13 preceding assignments of error with which we have already dealt. Accordingly, we pretermit further discussion of them.
Additionally, the defendant moved for a new trial on the ground that the court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error, viz., (1) the court's denial of defendant's motion to quash the indictment, (2) its failure to restrain the district attorney from using prior convictions on cross examination, (3) and its refusal to give jury charges requested by defendant.
The defendant's motion to quash the indictment included allegations regarding alleged irregularities in the grand jury proceedings. No evidence was provided to substantiate these allegations. The defendant also asserted that the indictment failed to charge an offense which is punishable under a valid statute in that Louisiana's first-degree murder statute, La.R.S. 14:30, provides for cruel and unusual punishment. We find no error in the trial court's denial of defendant's motion to quash. Cf. State v. Payton, 361 So.2d 866 (La.1978).
Defendant urged, in his motion for a new trial, that the trial court erred in not granting his motion to restrain the district attorney from using prior convictions on cross examination. It was argued that Robert Willie would be inhibited from testifying in his own behalf unless the court were to restrain the district attorney from using prior convictions to impeach Willie's credibility. We find no error in the trial court's denial of this motion. La.R.S. 15:495; Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); State v. Prather, 290 So.2d 840 (La.1974).
The defendant argued that the trial court erred in its refusal to give requested *1032 jury charges numbers two and three. The substance of special jury charges numbers two and three was included in the general charge and the charges were superfluous. La.C.Cr.P. art. 807.
Consequently, we find that the trial court did not err in denying defendant's motion for a new trial.
ASSIGNMENT OF ERROR NO. 15
Defendant argues that an error patent on the face of the record might require reversal of the conviction. No specific error patent is alleged. A review of the record shows no errors patent. Accordingly, this assignment lacks merit.
B. THE PENALTY TRIAL
In the penalty phase of the case, the prosecuting attorney presented two arguments to the jury which created a reasonable possibility that the death sentence was imposed under the influence of passion, prejudice or arbitrary factors. Essentially these arguments urged the jury to impose the death penalty to prevent the defendant from receiving a pardon or commutation and encouraged the jury to view its selection of the penalty as a tentative one subject to change by numerous reviewing courts.
1. Argument as to Governor's powers of pardon and commutation:
The prosecuting attorney presented the following argument to the jury:
"* * * Mr. McElroy said that the rest of his life behind bars with no parole, no probation, no suspension of sentence would be enough for Mr. Willie in this case, but once again let's look at things in a hard, cold light of reality and tell you the truth. He's right. The statute does say no probation, no parole, no suspension of sentence, but have you ever heard of pardon, commutation? Those are two things that are given to the governor of the State of Louisiana in the Constitution of the State of Louisiana and it can't be taken away by statute. As a result, the governor, whoever is the governor, eight, ten, twelve years from now, twenty years from now, can take it upon himself to let Robert Lee Willie back out onto the streets and back out into society, because that governor more than likely will not know the facts of this case. So don't think that life really ever means life, because it doesn't. * * *"
By this argument, the jury was informed that a sentence of life without benefit of parole would not protect society from a dangerous criminal because (1) the Governor may commute sentences and pardon those convicted; (2) a future governor considering clemency in a particular case likely will not know the facts of the case; and (3) in practice, a life sentence is never carried out. The prosecuting attorney's argument that the death penalty should be imposed to avoid the defendant's almost certain release through an ill considered pardon or commutation was highly prejudicial. It called on the jury to base its decision on a consideration outside the scope of its authority and referred to facts upon which no evidence had been introduced.
The trial court did not instruct the jury to disregard the argument or the inaccurate and misleading information it contained.
The constitutionality of any death penalty scheme depends on whether the jury's discretion is channeled and guided by clear, objective and specific standards. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). A capital punishment procedure which leaves to the jury's unbridled discretion the selection of those defendants who shall receive the death sentence will be struck down. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). Accordingly, the statutes under which defendant's death sentence was imposed were based on those approved by the United States Supreme Court as providing adequate standards to guide the jury in selecting those among first degree murderers who should receive the death penalty. *1033 Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); State v. Payton, 361 So.2d 866 (La.1978).
The legislative aim of our death penalty scheme is clear. The sentencing hearing must focus on the circumstances of the offense and the character and propensities of the offender. La.C.Cr.P. art. 905.2. The sentence will be life imprisonment without parole, probation, or suspension of sentence unless the jury finds unanimously and beyond a reasonable doubt at least one statutorily defined "aggravating circumstance." La.C.Cr.P. art. 905.3. Having found a statutory aggravating circumstance, the jury is required to consider evidence of any mitigating circumstances, and to weigh it against the statutory aggravating circumstance(s) so found, before recommending the more appropriate penalty, either a penalty of life imprisonment without parole or a sentence of death. State v. Sonnier, 402 So.2d 650, 657 (La. 1981).
An argument based on the law governing pardon and commutation or its administration by the governor and other executive officers is entirely inappropriate to a capital sentencing proceeding. Only evidence relevant to a statutorily prescribed aggravating circumstance, a mitigating circumstance, or the character and propensities of the offender is properly admissible at such a hearing. La.C.Cr.P. arts. 905.2, 905.4, 905.5. The capital sentencing hearing must be conducted according to the rules of evidence and, insofar as applicable, the code of criminal procedure. La.C.Cr.P. art. 905.2. Consequently, the argument at a sentencing hearing may not appeal to prejudice and must be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. La.C.Cr.P. art. 774. Since the law of pardon and commutation was not applicable to the case and evidence pertaining to the governor's exercise of these powers was inadmissable, the prosecuting attorney's argument erroneously and prejudicially exceeded its proper scope.
There is more at issue in this case, however, than whether prosecuting attorneys and trial courts must follow statutory rules of evidence and procedure. The injection of pardon and commutation questions into a sentence proceeding tends to skew the legislature's constitutionally sound death penalty scheme. Jurors are thereby encouraged to consider the vicissitudes of executive clemency instead of the clear, objective, and specific standards enacted for the purpose of channeling their discretion. Although the jury has no constitutional oversight of executive policy, it is impelled, although ill equipped, to predict and pass judgment on future pardon and commutation practices. The substitution of this conundrum for the clear, objective statutory standards encourages the jury to exercise unbridled discretion reminiscent of the latitude found constitutionally objectionable by the United States Supreme Court in our former statute. Roberts v. Louisiana, supra.
For these reasons and others, this court has held that conditions under which a person sentenced to life imprisonment without benefit of parole can be released at some time in the future are not a proper consideration for a capital sentencing jury and shall not be discussed in the jury's presence. Further, in reviewing a capital case in which an offender's potential for future release has been injected into the proceedings by the state or the trial court, this court must presume that a death sentence was imposed under the influence of an arbitrary factor unless the record clearly indicates that the jury was properly informed of its duty and admonished to disregard the improper remarks, and the record indicates that the jury heeded the admonition. State v. Lindsey 404 So.2d 466 (La. 1981). See also, State ex rel., Williams v. Blackburn, 396 So.2d 1249 (La.1981); State v. Monroe, 397 So.2d 1258 (La.1981); State v. Sonnier, 379 So.2d 1336, 1364 (La.1979) (Dennis, J., concurring in part and dissenting in part); State v. Sonnier, supra at 1368 (on rehearing).
In a thorough consideration of this problem in State v. Lindsey, supra, this court *1034 noted the legal and practical considerations which weigh against the discussion of pardon or commutation in the jury's presence: to accurately inform jurors of probabilities of release and applicable time frames would create a whole new phase of sentencing and divert the jurors from their primary responsibility. The Code of Criminal Procedure does not provide for jury consideration of an offender's future potential for release. Speculation as to the actual length of a life sentence is not even remotely related to the statutorily prescribed sentencing standards, viz., the circumstances of the offense, and the character and propensities of the offender. The interjection of pardon and commutation issues provokes questions that no human mind can answer and in substance transposes the task of the governor to the jury. In this latter respect it induces the jury to pass judgment upon the very issue entrusted only to the governor and could prevent him from deciding the issue at the proper time.
Applying these precepts to the present case, it is clear that the sentence must be set aside and that a new penalty hearing must be held. The prosecuting attorney explicitly asked the jury to assume that Willie would be pardoned or have his sentence commuted in considering whether he should live or die. Furthermore, he compounded his prejudicial remarks by inaccurately stating that a future governor considering Willie's application for pardon or commutation would more than likely not know the facts of the case and by his misleading assertion that a life sentence never exacts lifetime imprisonment. The trial court gave no admonition or instruction which would dispell any of the effects of this improper, erroneous and misleading argument.
2. Presentation of Argument as to Appellate Review of Death Sentences
The prosecution further argued:
The other thing is a lot of times people would like to think let jurors think the buck stops with you. The buck stops with you. After this, there ain't no review. You all come back with the death sentence, he's going to the chair. Ladies and gentlemen of the jury, every word that has been said during the course of this trial, every piece of evidence that has been entered into the record during the course of this trial, all the motions that were filed and heard prior to this trial, and everything will more than likely be reviewed by every appeals court in this state, including the Supreme Court of this state. It has to go to them, as a matter of fact, by law, and once that's over, then the federal appeal begins, both in the district courts, the federal district courts, the federal appellate courts, and the Supreme Court of the United States of America, before anybody is put in the chair. So the buck really don't stop with you. The buck starts with you, because without the death penalty, then they won't have all those reviews to determine whether his trial was conducted properly, he got a fair trial, he got a fair hearing, and a jury of twelve people after hearing the evidence and the testimony decided that his man, this man, had forfeited his right to live in society with the rest of us, and he has done exactly that. Forfeited his right, because of what he and Joe Vaccaro did. So what I'm asking you to do is start the buck rolling. Let's find out whether we conducted this trial properly, and let's come back with a sentence that Robert Lee Willie deserves, and that's death in the electric chair. Thank you.
A prosecutor's argument conveying the message that the jurors' awesome responsibility is lessened by the fact that their decision is not the final one, or which contains inaccurate or misleading information, deprives the defendant of a fair trial in the sentencing phase and requires that the death penalty be vacated. State v. Monroe, 397 So.2d 1258 (La.1981); State v. Berry, 391 So.2d 406 (La.1980); Id. at 419 (Calogero, J. dissenting to denial of rehearing).
In the present case, the prosecuting attorney told the jurors that: (1) the "buck," i.e., the responsibility for the death *1035 sentence, doesn't stop with them; it starts with them and is passed on to a series of courts; (2) "everything" will more than likely be reviewed by "every appeals court in the state," the state supreme court, the federal district court, the federal appellate courts, and the United States Supreme Court.
This type of argument may not be made in a criminal case in which the punishment may be capital. Jurors should approach the task of finding facts and exercising discretion as to choice of penalty with appreciation that their duties are serious and that they are accountable for their decisions, not with the feeling that they are making mere tentative determinations which the courts can correct. An argument improperly diminishes the jury's duty and responsibility if it implies that a reviewing court can substitute its judgment as to choice of punishment or that the decision of whether the sentence of death is appropriate is not entirely the jury's responsibility.
In addition to implying that the jury's decision is a tentative one, the prosecuting attorney's remarks were misleading as to the number of courts which would review the case and as to the nature of each judicial review. Contrary to the impression conveyed, no court will reweigh the evidence and make a de novo determination of whether death is the appropriate penalty. Further, only this court can review the case on direct appeal; certainly not "every appeals court in the state", since their jurisdiction is presently limited to civil and juvenile matters. Finally, any review by a federal court, including the United States Supreme Court, is solely within its discretion and, if it occurs, is apt to center on legal questions far removed from the question of the appropriate penalty which the jury is called upon to decide.
In view of the foregoing, this court would be called upon to vacate the sentence and order a new penalty hearing even in the absence of the other improper, misleading and inaccurate argument discussed initially.

DECREE
Accordingly, the Defendant's conviction is affirmed but his sentence is vacated. The case is remanded to the trial court for it to determine whether the undisclosed note, or evidence which could be obtained therefrom, would, upon its evaluation in the context of the entire record, create a reasonable doubt as to the defendant's guilt. Should the trial court find that such a reasonable doubt exists after its evidentiary hearing, a new trial will be required. If the trial court finds, after an evaluation as described, that there is no reasonable doubt as to the defendant's guilt, the conviction will be affirmed[4] and a new jury shall be impanelled to determine only the issue of penalty in accordance with the procedure set out in La.C.Cr.P. art. 905.1(B).
CONVICTION CONDITIONALLY AFFIRMED; SENTENCE VACATED; REMANDED.
MARCUS, J., concurs in part and dissents in part and assigns reasons.
WATSON, J., concurs in the conditional affirmance of defendant's conviction but dissents from the reversal of sentence.
LEMMON, J., concurs and will assign reasons.
MARCUS, Justice (concurring in part and dissenting in part).
I concur in the affirmance of defendant's conviction subject to the remand but dissent from the reversal of his sentence because of certain comments made by the prosecutor during rebuttal argument. In the first place, defendant failed to object to the statements at the time of the occurrences. Moreover, even in the event of improper argument, a verdict should not be set aside unless it is clear that the jury was influenced by the remarks and that they contributed to the verdict. State v. Simms, 381 *1036 So.2d 472 (La.1980); State v. Lockett, 332 So.2d 443 (La.1976). I do not consider that such was the case here.
LEMMON, Justice, concurring.
I agree that the conviction should be affirmed, but that the death penalty must be set aside because of the prosecutor's speculative comments on the possible effects of a gubernatorial pardon if the jury recommended a sentence of life imprisonment.[1]
I do not subscribe, however, to the majority's characterization of the prosecutor's comments on appellate review of the death sentence in this case as "implying that the jury's decision is a tentative one", nor do I subscribe to any suggestion that such comments necessarily tend to lessen the jury's awesome responsibility.
As this court pointed out in State v. Berry, 391 So.2d 406 (La.1980), comments on appellate review of the death sentence should be approached very cautiously, because they may convey a faulty impression of the jury's critical role in the assessment of penalty in capital cases. However, this court has not adopted (and should not adopt) a "per se rule" that any reference to appellate review of the jury's recommended sentence defeats the defendant's right to a fair penalty trial.
Speaking generally, I see nothing wrong with a prosecutor's accurate description of the safeguards provided by law against an arbitrary imposition of the death penalty and of the jury's role in the overall scheme of determining and imposing capital punishment. The issue in each case must therefore be whether a prosecutorial comment on appellate review of the death penalty is inaccurate, misleading or otherwise unfairly prejudicial[2].
Apparently, the comments on appellate review in this case were not made in such a way as to be manifestly prejudicial to the defendant, since the defense attorney did not object during the argument.[3] While I would not hesitate to reverse a death sentence when unfairly prejudicial comments are made without objection, I view the lack of objection as an indication of the context and "courtroom atmosphere" within which the comments were made.[4] I further note that the trial occurred prior to this court's decision on rehearing in State v. Berry, *1037 above, which first questioned the prosecutor's comments on appellate review of a death sentence.
NOTES
[1] A number of factors must be considered in determining whether to change venue. As this court noted in State v. Bell,

Some relevant factors in determining whether to change venue are (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. See, generally, Annotation, 33 A.L.R.3d 17 (1970).
Other factors we have indicated are relevant to this inquiry include:
"* * * The degree to which the publicity has circulated in areas to which venue could be changed, the care exercised and the ease encountered in the selection of the jury, the familiarity with the publicity complained of and its resultant effect, if any, upon the prospective jurors or the trial jurors, and the peremptory challenges for cause exercised by the defendant in the selection of a jury. See, generally. Annotation 33 A.L.R.3d 17 (1970)" State v. Bell, 346 So.2d 1090 (La.1977); State v. Berry, 329 So.2d 728 (La. 1976).
[2] By custodial interrogation the Supreme Court meant questioning initiated by law enforcement officials after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Miranda v. Arizona, 384 U.S. at 444, 86 S.Ct. at 1612; State v. Menne, 380 So.2d 14 (La.1980).
[3] "We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them." 86 S.Ct. at 1639.
[4] The proceedings and determinations of the trial court will be subject to review by this court on appeal.
[1] For an earlier discussion by this court of improper prosecutorial reference to the possibility of gubernatorial pardons in capital cases, see State v. Johnson, 151 La. 625, 92 So. 139 (1922); State v. Lindsey, 406 So.2d 466 (La. 1981)
[2] In State v. Berry, above, this court, while warning prosecutors of the dangers of such comments, said:

"[V]irtually every person of age eligible for jury service knows that death penalties are reviewed on appeal. There is no absolute prohibition against references to this fact of common knowledge, and this court should not impose an absolute prohibition, since such a reference does not necessarily serve to induce a juror to disregard his responsibility. The issue should be determined in each individual case by viewing such a reference to appellate review in the context in which the remark was made." 391 So.2d at 481.
[3] The prosecutor in this case was not precisely accurate in his references to review by "every state appeals court" or to appeals (rather than discretionary review) in the federal system. Nevertheless, I do not believe that the comments on judicial review served to induce a juror to disregard his responsibility or to lessen the juror's appreciation of the significance of his role in the overall scheme of capital punishment.
[4] The "contemporaneous objection rule" is no bar to this court's review of capital sentencing hearings to determine whether fundamental unfairness so infected the proceedings as to require remand for a new penalty hearing. See State v. Sonnier, 379 So.2d 1336 (La.1980). However, not all "improperly admitted if objected to" matters require reversal under this court's approach in Sonnier. Only such occurrences (whether in the form of remarks by the prosecutor, comments by the judge, testimony by witnesses or procedural irregularities) which are so flagrantly prejudicial as to undermine the fundamental fairness of the jury's recommendation fall within this judicially recognized category of "plain error". See Fed.R. Crim.P. 51 and 52. Thus, although not dispositive of the question of this court's authority to review the alleged error, the failure of counsel to object will (at least for this member of this court) be a very significant indication of either trial strategy or of counsel's determination that the occurrence was not unduly prejudicial when taken in context.