DREW, J.
 

 | iBrandon Davis was convicted by a jury of first degree murder, and was sentenced to life imprisonment without benefit of probation, parole or suspension. He appeals, urging the insufficiency of evidence. We affirm.
 

 FACTS
 

 At daybreak on April 23, 2005, Chief Harry L. Lowery of Caddo Parish Fire District Two was dispatched to a car fire on Kuhn Road. The trunk lid had melted away during the fire and he observed a charred body lying on its right side with its head facing toward the driver’s compartment.
 

 Sgt. Dale Hubbard of the Caddo Parish Sheriffs Office testified that when he arrived on the scene of the car fire, he was handed a license plate from the burnt vehicle. He and Lt. William Rehak observed the horrific scene in the trunk.
 

 That morning, Caddo Det. Terry Richardson was told that a body had been discovered in the trunk of a burning car. He ran the license plate and learned that it was rented by Renee Farley from Hertz Rental in Houston, Texas.
 

 Ms. Farley told Detective Richardson that:
 

 • she had rented two cars, a Nissan Altima and a Toyota Camry;
 

 • two of her cousins, Tonya Douglas and Tosha Lampkin,
 
 [1]
 
 were in the Altima; she was driving the Camry;
 

 • Douglas and Lampkin were staying at the David Motel in Bossier City; and
 

 • Douglas had called that morning, looking for Lampkin.
 

 |2Pet. Richardson and Lt. Rehak met with Tonya Douglas at the David Motel in Bossier City. With her permission, the officers searched the motel room and took a Texas I.D. card, toothbrush, and a traffic citation that had been given to Tosha Lampkin during their drive from Houston to visit with local family.
 

 When Douglas and Lampkin had arrived in the area, they drove to the David Motel since it was too late to visit their family. They ordered some take-out food from a nearby Waffle House. Lampkin left to pick up the food around 3:00 that morning. Douglas fell asleep after Lampkin left and woke up around 8:00 a.m. without having seen her. She was unable to find anyone who had spoken to Lampkin.
 

 Det. Richardson noticed camera monitors, so he asked the manager for the surveillance tapes. Chagan Parbhu, owner of the David Motel, obliged and testified regarding the surveillance footage from his motel.
 

 No one in the motel had seen or heard anything, so Richardson and Rehak went to the Waffle House and retrieved the food receipts for early that morning. Ann Smith, an employee of the diner, identified a ticket and receipt from the restaurant showing that the victim picked up her food between 2:00 and 4:00 a.m.
 

 Richardson and Rehak returned to their office and began viewing the hotel surveillance footage and observed that:
 

 • the tape’s clock was off by approximately an hour;
 

 
 *363
 
 • the Nissan Altima left the lot and returned shortly thereafter, followed by a small red car;
 

 Is* the two vehicles briefly stopped at the hotel, then left at the same time.
 

 The motel video footage was shown on the local news to see if anyone recognized the red car. This media request ultimately led them to Mrs. Stafford, who said that the red car on the surveillance footage belonged to her daughter, Laquetta Stafford. Det. Richardson noticed the red car in the parking lot. Laquetta Stafford informed him that on the night in question she had loaned her car to Dwight Bacon, who was gone all night. She also told Det. Richardson where Bacon lived.
 

 Laquetta Stafford testified at trial that:
 

 • at the time of the murder, she owned a red Toyota Tercel that was distinctive because of two different sets of rims (Ford on the front, Toyota on the back), a missing strip from the side paneling, and a towel in the back window;
 

 • Bacon wanted to borrow her car to visit his girlfriend at around 9:30 p.m. on April 22, to which she agreed after he offered to put gas in the car;
 

 • Bacon had never borrowed her vehicle before;
 

 • she did not hear from or see Bacon again until daybreak;
 

 • she called him on the cell phone she had lent him;
 

 • he said he was on his way and hung up;
 

 • she heard him talking to another male outside but couldn’t understand the words and didn’t recognize the voice;
 

 • she found a contact lens case in the back seat with “Rebecca” written on it;
 

 • her mother advised that her car was on the news; and
 

 • she gave the contact lens case to Det. Richardson.
 
 [2]
 

 |4 Rebecca Speed testified that:
 

 • at 1:00 a.m. on April 22, 2005, she pulled into her apartment complex, turned off the ignition, and was listening to the radio with her car windows down;
 

 • she heard someone say “hey”;
 

 • when she looked, there was a man standing next to her window with a gun;
 

 • she fled from the man and quickly told the complex security guard;
 

 • her car, with her purse inside it, was taken and discovered approximately two hours later, with almost all of the purse’s contents missing;
 

 • she lost a contact lens case that had “Rebecca” written on it;
 

 • she heard it described on the news and contacted the sheriffs department;
 

 • she was shown a photo lineup, and she picked photo # 3, being 80-85% sure that the man in that lineup photo was her carjacker;
 
 [3]
 

 • she did not know Brandon Davis, Dwight Bacon, or Laquetta Stafford; and
 

 • accordingly, she could not give any other explanation for how her contact lens case came to be in Laquetta Stafford’s car.
 

 Det. Angela Pell was called to the scene of Speed’s (apparent) carjacking and stated that based on the surveillance footage of the incident, Speed’s description of the
 
 *364
 

 perpetrator
 
 (5'4"-5'6", wearing a blue sweatshirt and blue jeans) was consistent with the image of the perpetrator in the motel surveillance footage.
 

 Det. Richardson went to Bacon’s apartment and a black male in his 20s answered the door. Richardson identified the man as Dwight Bacon and | ¿asked him and Christina Burnett (a juvenile also present in the apartment) to come with him to the office, where Richardson and Rehak interviewed Bacon, after which they placed him under arrest. They then spoke to Bacon’s sister, Granada Bacon.
 

 Granada Bacon testified that she and Bacon lived together in an apartment along with Bacon’s girlfriend. Bacon did not own a vehicle at the time of the murder, and that night, Dwight, Granada, and Laquetta Stafford were at Bacon’s apartment. Bacon borrowed Stafford’s red, two-door car that night and his sister did not see him again until approximately 7:00 the following morning.
 

 Through the testimony of Del Irving, an employee of the Cash ‘N A Flash pawnshop, the state introduced the federal fix-e-arm fonn and pawn ticket filled out by Bacon on Api-il 22, 2005, to í-etiieve his Hi-Point Model CF .380 handgun. Irving also px-oduced a l-eceipt showing that some .380 ammunition was purchased by Bacon at the same time. The sei-ial number from the firearm was recorded on several of the forms and was identified as “P814629.” The pawn shop’s surveillance video was played for the jury dui-ing Irving’s testimony.
 

 Kevin Ward, another pawn shop employee, testified that he assisted Bacon on April 22.
 
 [4]
 
 He identified the defendant in a photographic lineup.
 

 Sgt. Malcolm Laing of the Caddo Parish Sheriffs Office testified that:
 

 most of the area pawnshops had joined a group where pawn information would be reported through a computer system accessible by law enforcement online;
 

 • he conducted a search using Bacon’s name and discovered the location where he had pawned and redeemed a .380-caliber handgun;
 

 • he assisted in the search of Bacon’s apartment where the .380-caliber handgun was located and found that the serial number matched that of the handgun pawned and redeemed by Bacon on Api'il 22; and
 

 • dui'ing that seai-ch, officers found a partial box of American Eagle cartridges.
 

 Officers were able to locate Davis on April 27, after intei-viewing Bacon. Davis agreed to accompany the officers and make a statement that day. During his first interview, the officers repeatedly tried to get a confession from the defendant, but Davis asserted his innocence throughout the interview. He admitted having been inside the red car before, but not on the night in question. The officers informed him that the only time Bacon had ever driven that car was on April 22.
 

 Det. Richardson testified that Davis:
 

 • admitted knowing Bacon;
 

 • admitted being in the little red car on only one night;
 

 • denied knowing what Bacon’s intentions were;
 

 • said he wished that Tosha hadn’t died;
 

 • said. he had never held Bacon’s gun before; and
 

 • remained emotionless through the whole interview.
 

 
 *365
 
 Lt. Rehak testified that Davis said he had an alibi, and that he’d been in the red ear with Bacon, but just not on the night of the murder.
 

 |7Pavis was interviewed twice on April 28 by Det. Ward and Lt. Rehak.
 

 Detective Kay Ward testified that:
 

 • at the end of her first interview with the defendant, he was emotional;
 

 • in the last interview, Davis related how and where the fire was started;
 

 • Davis admitting holding the gun at one point during the evening;
 

 • he didn’t plan to kill anybody;
 

 • while the incident was ongoing, he was speechless, standing outside his body;
 

 • the fire was started in the back seat of the car; and
 

 • the victim was alive and conscious when she was put in the trunk.
 

 Lt. Rehak recalled that during the third interview, the defendant said,
 

 He and Dwight ... did go to the David Hotel. They encountered a female there. That when they left he followed Dwight. Dwight was in the red car, he was in the gray Altima with Tosha Lampkin, the victim, that she was told to drive and follow the red car.
 

 That she was put or told to get into the trunk of the car and that the car was set on fire in the passenger seat by lighting a box that was behind the driver’s seat but it was in the back seat, lighting the box and using some grass and like some dry grass and weeds from the side of the road. She was alive when the fire started.
 

 When Lt. Rehak asked if the defendant had sex with her, the defendant responded, “Don’t make me answer that.” The defendant finally admitted that he and Bacon took some money from the victim.
 

 Corporal Jeff Thomas, who was accepted as an expert in fingerprint analysis and crime scene investigations, testified that:
 

 18* he was dispatched to examine the burned car;
 

 • there was no way for him to obtain latent prints as nothing remained from which to take fingerprints because of the fire and the water hoses used to douse the fire;
 

 • he received several spent and live cartridges recovered from the scene;
 

 • he noted two bullet holes near the gas tank fill area;
 

 • after the vehicle was moved to the storage facility, he found a key in the trunk locking mechanism that had fallen inside the trunk when the lid melted;
 

 • he also found several gold teeth, one with what looked like the letter “T” etched into it, and some bobby pins;
 

 • he also processed Laquetta Stafford’s vehicle several days later but was unable to make any identifications from the prints found on that car;
 

 • he was involved in a search of Bacon’s apartment and located a shoe box with a Hi-Point .380 semiautomatic handgun on a shelf in the bedroom closet, loaded with live cartridges;
 

 • no prints were obtained from the gun; and
 

 • he took DNA swabs from the firearm and buccal swabs from the defendant.
 

 Caddo Sheriffs Lt. Owen McDonnell testified as an expert in the areas of “friction skin analysis and comparison” and “crime scene analysis and reconstruction.” He testified that he was able to determine a range of distances from which the shots were fired into the vehicle:
 

 
 *366
 
 By taking the two bullets and coming back to where they would converge and then taking into account the fact that the gun is not going to be stationary the whole time it was fired, you can estimate that it was two to five feet, from two to five feet back towards this way and approximately four and a half to seven and a half feet away from the vehicle.
 

 |flLt. McDonald also testified that La-quetta Stafford’s vehicle was leaking transmission fluid when it was searched, and officers at the scene of the burning car noticed an oily spot
 
 on
 
 the road to the east of the burning vehicle.
 

 The state called Richard Beighley as an expert in the field of firearms identification. He identified two of the .880 cartridges found at the scene as being fired from the .380-caliber Hi-Point pistol taken from Bacon’s apartment. Beighley also stated that the ammunition found in Bacon’s apartment had a Federal head stamp, brass primer with a brass cartridge and was a full metal jacket, as were all the casings found at the scene and the ammunition inside the firearm.
 

 Stewart G. Paley testified as an expert in forensic DNA analysis. He was tasked with identifying the victim. He examined the victim’s toothbrush, a piece of a femur, and a piece of a right rib, testifying:
 

 The results were that the DNA profile obtained from the femur was consistent, matching at every locus with the DNA profile we obtained from the toothbrush. We just can’t say that it matches and everybody gets to go home. We have to put some sort of significance on the profile. And because we can tell you that DNA profile is unique to everyone, but unless we test everyone in the world, we have to actually give some sort of significance and run some statistics. So the probability of finding the same DNA profile in someone else — -and just the frequency of this profile was one in 48.3 quadrillion. So what that means is on average, I have to look at 48 .3 quadrillion DNA profiles before I came across this exact profile. And since there are about 6.6 billion people in the world, that makes a pretty good case that this is a good identification.
 

 Finally, Det. Richardson was notified that Jarrett Ardoin, a former inmate of the Caddo Correctional Center with the defendant, might have some information regarding the case. Richardson interviewed Ar-doin, who | xpidentified the defendant in a lineup, and gave officers several cards and letters given to him by the defendant while they were incarcerated together for eight months. Ardoin
 
 [5]
 
 met the defendant in the Caddo Correctional Center in April 2005. Ardoin asked Davis what he was in jail for, and testified as to the response he received:
 

 He told me that him and the other guy, Dewight [sic ], that they were on Airline, I think, I believe, and they seen her in the car at the — I mean leaving the Waffle House and they followed her to the motel and pulled up behind her car at the motel and [defendant] got out of the vehicle and got in the passenger side and made her leave with the gun on her and the other guy followed them to the first place they went to.
 

 He told me that he had anal sex and vaginal sex with her and that while he was having vaginal sex with her they were making her perform oral sex on
 
 *367
 
 the other guy and then they left that scene and went to the second place where the murder and the sex happened again.
 

 He told me that, um, they didn’t intend to kill her, it was just a robbery and I don’t think that they intended to kill her because he said that that wasn’t the intention, it turned out that way. The reason why he said they did it like that was to get rid of the evidence and they were worried that she was going to remember the license plate from the vehicle in front and he told me that she promised that she wasn’t going to tell nobody and that she had a ten-year-old at home and please not to kill her.
 

 Finally, Ardoin read from a letter that Davis passed to him in jail:
 

 I’m going to tell you something because I know you probably got a shitty feeling about me. First, I’m not a hardcore gangster. As we followed that person I know in my mind that that person didn’t have nothing worth committing a crime over. The stuff we got was nowhere near — nowhere near and the money wasn’t close to a hundred, maybe eighty. And when you was steady asking me questions I was tripping, what did we do with the money. Hell, my friend, it wasn’t shit to do |T1 anything with. Like you thought, I was trying to show a mother fucker I was still wild and went along with some dumb shit and I deserve to get punished.
 

 Even though I have a lot of good in me I’m completely embarrassed of telling you my crimes, that’s why I trip it on you — trip out on you. But I’m not telling you this to have to tell somebody, I just want to be completely truthful to somebody. I’m just a young mother fucker that’s went through a little hard time and made a lot of bad decisions. I never really sold drugs but what embarrasses me the most I’ve took somebody away from life and now I’m charged with that kind of crime. Maybe all my dirt has caught up on me.
 

 Thug, I’m not trying to impress you, this is me, I haven’t done shit to impress nobody and I’m beginning to feel a lot better giving you the absolute truth because I know sooner or later you’re going to be gone and I feel like we’re using each other to pass time but my feelings are kind of serious.
 

 Dam [sic ], I’m just a petty robber that’s done stuck his feet off in some deep shit. So now you know what the deal is. Ain’t no sense — ain’t no sense of fronting or fainting[.]
 

 David Hensley, an investigator with the Caddo Parish District Attorney’s Office, obtained a handwriting exemplar from the defendant while he was incarcerated at Caddo Correctional Center.
 

 Robert Foley was called to testify as an expert in forensic document examination and handwriting comparison. He testified that the writer of the known samples (Davis) wrote the letter in question.
 

 Chief Deputy Coroner Joseph Johnson testified merely to authenticate the autopsy photographs and reports.
 

 Caddo Parish D.A.’s Investigator Rusty McKinley testified that he went to the coroner’s office to inquire as to the cause of death, whether there were any projectiles lodged in the body, and whether evidence of a sexual assault could be obtained. He noted the cherry red color of the victim’s body, under the charred outside.
 

 112The state called Dr. Frank Paretti, who was accepted as an expert in forensic pathology, and who testified as to the cause and nature of the victim’s death:
 

 
 *368
 
 Well, first of all, the body was extensively charred or burnt, there were no grossly recognizable features that I was able to see or Dr. McCormick himself. He was not — he didn’t document any injuries externally. The internal examination the majority
 
 [sic
 
 ] of the organs were burnt, there was a lot of charring and burning of the internal organs. Of significant note what was important, what was documented was there was soot or smoke present in the upper and lower air passages. And the organs some of the organs that were relatively uninvolved upon sectioning had a cherry red discoloration. Now, that’s important because inside we’re not cherry red we’re more like dark red and when you see cherry red it indicates an exfixial [asphyxial] type death such as due to carbon monoxide.
 

 Your blood what happens is the oxygen normally attaches onto the red blood cell and the carbon monoxide or the smoke has a higher affinity so they attach onto the molecule so it makes you turn bright red pink and you can see that externally and internally that really pink inside. And as I mentioned, there was soot present in the upper and lower air passages, there were no other documented injuries.
 

 Sadly, Dr. Paretti established that the victim was alive when the vehicle was set on fire because she was able to inhale the smoke. The body’s severely burnt state precluded taking anal and vaginal smears. A piece of liver was sent for toxicology screening and the carbon monoxide level was 19%.
 
 [6]
 

 The defendant put on no evidence. The jury returned a verdict of guilty as charged of first degree murder, but was unable to return a recommendation during the penalty phase, so the court sentenced the | isdefendant to the mandatory life imprisonment at hard labor without benefit of probation, parole, or suspension.
 

 DISCUSSION
 

 The defense argues that the evidence was insufficient because:
 

 • the defendant’s confessions were vague and unreliable;
 

 • he asserted innocence throughout;
 

 • the confessions were uncorroborated by other evidence;
 

 • the confession, by itself, is insufficient to support the verdict in this case, citing
 
 State v. Willie,
 
 410 So.2d 1019 (La.1982);
 

 • the present case is analogous to
 
 State v. Whittington,
 
 450 So.2d 47 (La.App. 3d Cir.1984), where the Third Circuit held that absent a
 
 corpus delicti,
 
 an accused cannot be convicted on a confession alone; and
 

 • the defendant lacked the intent necessary to be guilty of first degree murder.
 

 The state argues that “[ajppellant’s admissions and the other evidence are such that an application of the
 
 Jackson
 
 standard leads to the conclusion that the jury’s unanimous verdict of guilty was based on sufficient evidence.” The state argues that the victim was murdered during the course of several of the enumerated felonies contained in the statute and that the murder was conducted in such a manner that there can be no doubt death was the intended result.
 

 
 *369
 
 Our law on reviewing sufficiency of the evidence is well settled.
 
 [7]
 

 | piFirst Degree Murder is defined, in pertinent part, in La. R.S. 14:30(A) as:
 

 [T]he killing of a human being:
 

 (1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simple robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles!.]
 

 Principals are defined in La. R.S. 14:24 as:
 

 All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet injjsits commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
 

 The defense cites
 
 State v. Willie, supra,
 
 and
 
 State v. Whittington, supra,
 
 for the argument that a defendant cannot be convicted using only his own confession without proof of the
 
 corpus delicti.
 
 The defense attempts to analogize from these cases and argues that there was no physical evidence linking the defendant to this
 
 *370
 
 murder, so his confession alone could not implicate him. This is a baseless analogy.
 

 In
 
 Willie,
 
 the Louisiana Supreme Court reiterated the “well settled” statement that “an accused party cannot be legally convicted on his own uncorroborated confession without proof that a crime had been committed by someone; in other words, without proof of the
 
 corpus delicti,
 
 [citations omitted.]” The
 
 Willie
 
 court ruled that the
 
 corpus delicti
 
 must be proven beyond a reasonable doubt. The supreme court held that it was proven in
 
 Willie,
 
 because even though the corpse was discovered partially decomposed, several items of evidence connected the body with the identity of the victim and her injuries suggested that she had died as a result of the criminal agency of someone.
 

 The
 
 Whittington
 
 court held that hearsay testimony that someone had burglarized a church was not sufficient to prove the existence of the
 
 corpus delicti.
 

 This court directly addressed this issue in
 
 State v. Cutwright,
 
 626 So.2d 780, 783-784 (La.App. 2d Cir.1993),
 
 writ denied,
 
 93-2931 (La.2/25/94), 632 So.2d 761. This court stated:
 

 hfiln any criminal prosecution the corpus delicti must be established independently of a defendant’s extrajudicial statement, confession or admission.... The corroboration rule requires only that there be some evidence, besides the confession, that a criminal act was committed by someone[.]
 

 A confession alone can supply the proof linking an accused to a crime, once the death is shown to be by violent means.
 
 See State v. Celestine,
 
 452 So.2d 676 (La. 1984);
 
 State v. Romero,
 
 369 So.2d 1342 (La.1979).
 

 This evidence shows that Tosha Lamp-kin was killed by being locked in the trunk of a car, which was set on fire. Bacon was involved in the crime because his gun was used to shoot holes in the side of Ms. Lampkin’s rental car. Surveillance footage shows Bacon’s borrowed car and the rental car being operated in concert.
 

 During his first interview, the defendant gave conflicting statements, first insisting that he had never seen Bacon driving anything but Bacon’s sister’s black car, then admitting being in a little red car with Bacon but not on April 22, 2005.
 

 During the second interview, the defendant’s demeanor was somewhat different from that during the first interview. His tone of voice was more resigned.
 

 During the final interview, the defendant began to say that they had no reason to kill the victim and that he hadn’t planned to kill anyone that night. He then gave details of the crime to the officers, including the fact that the victim was alive and conscious when she was put in the trunk and |17when the fire was set. He stated that the fire was started in the back seat of the car behind the driver’s seat.
 

 It was clearly proven that:
 

 • Tosha Lampkin died as a result of the criminal agency of someone;
 

 • Davis was heavily involved in all of the evening’s sordid events, starting with his foiled practice run at the very fortunate Rebecca Speed;
 

 • he got in the vehicle with Ms. Lamp-kin and made her follow Bacon;
 

 • he anally and vaginally raped the victim and then drove her to the place of her death; and
 

 • while conscious, she was forced into the trunk of a car that was set ablaze.
 

 The defendant’s confession is sufficient to uphold a conviction since evidence beyond a reasonable doubt of the
 
 corpus delicti
 
 is clearly present. The jury’s determinations as to credibility and believa
 
 *371
 
 bility should not be overturned absent an abuse of discretion, and this record reflects none whatsoever.
 

 DECREE
 

 The defendant’s conviction and sentence are AFFIRMED.
 

 [1]
 

 . Ms. Lampkin was later determined to be the decedent.
 

 [2]
 

 . The glasses case was later identified as belonging to Rebecca Speed.
 

 [3]
 

 . The man in photograph 3 was subsequently identified during the trial by law enforcement officers as the defendant, Brandon Davis.
 

 [4]
 

 . A matter of hours before the murder and the other atrocities.
 

 [5]
 

 . His criminal history was described as possession of marijuana, theft, and “a prescription charge.”
 

 [6]
 

 . Dr. Paretti testified that "[t]hey say chronic smokers, people who smoke a lot, can have a carbon monoxide level of up to ten percent so you normally get over ten percent if you smoke four or five packs of cigarettes a day. So nineteen percent it's high, it indicates that she was alive and is inhaling the carbon monoxide or smoke.”
 

 [7]
 

 . The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Cummings,
 
 95-1377 (La.2/28/96), 668 So.2d 1132;
 
 State v. Murray,
 
 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488,
 
 writ denied,
 
 2002-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Robertson,
 
 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part.
 
 State
 
 v.
 
 Hill,
 
 42,025 (La.App. 2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529.
 

 The
 
 Jadison
 
 standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Parker,
 
 42,311 (La.App. 2d Cir.8/15/07), 963 So.2d 497;
 
 State v. Owens,
 
 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610,
 
 writ denied,
 
 98-2723 (La.2/5/99), 737 So.2d 747.
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 State v. Wiltcher,
 
 41,981 (La.App. 2d Cir.5/9/07), 956 So.2d 769;
 
 State v. Burd,
 
 40,480 (La.App. 2d Cir. 1/27/06), 921 So.2d 219,
 
 writ denied,
 
 2006-1083 (La.11/9/06), 941 So.2d 35.
 

 The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 State v. Casey,
 
 99-0023 (La.1/26/00), 775 So.2d 1022,
 
 cert. denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).